[No. 4781–1. Division One. November 13, 1978.]

BLANCHE O. PEEPLES, ET AL, *Appellants,* v. THE
PORT OF BELLINGHAM, *Respondent.*

*Sam Peach, Inc., P.S., Bogle & Gates, Robert W.
Graham,* and *Ronald T. Schaps,* for appellants.

*McCush, Kingsbury, O'Connor, Ludwigson, Thompson &
Hayes, John S. Ludwigson, Millhouse, Nelle & Packer,* and
*Richard Nelle,* for respondent.

ANDERSEN, A.C.J.—

FACTS OF CASE

Titleholders of approximately 2 1/2 acres of Blaine Har-
bor tidelands appeal from a judgment quieting title in the

Port of Bellingham by adverse possession.[1]

The tidelands in issue were purchased by the titleholders predecessor in interest at a tax sale in 1946.[2] In 1956, the same tidelands along with adjacent ones were conveyed by the City of Blaine by quitclaim deed to the Port of Bellingham. This was in connection with a program of major improvements to Blaine Harbor which was carried out in 1957.

The improvement program contemplated that the entire harbor area would be owned by the port and enclosed by a protective breakwater. A 1962 aerial photograph (exhibit 23) is illustrative.

The harbor is depicted with the tidelands in question appearing as marked in the upper right–hand quadrant of the harbor area as shown in the photograph.

In 1974, the titleholders commenced a quiet title action against the port and the port counterclaimed asking similar relief. The trial court held for the port and the titleholders bring this appeal.

One ultimate issue is presented.

ISSUE

Did the trial court err in concluding that the port had acquired title to the disputed tidelands by adverse possession?

DECISION

CONCLUSION. The trial court did not err in quieting title to the property in the port on the basis that it did.

Following a trial to the court, the trial court found as to the tidelands in issue that: a rip rap breakwater had been constructed by the port on one side of it; a pile and plank bulkhead had been constructed on the other side of it; a

---

[1]The City of Blaine has been dismissed as a party to this appeal by stipulation.

[2]The appellants' predecessor in interest paid $21 for the tidelands at a 1946 tax sale; the highest real estate taxes paid on the property, insofar as the record before us reflects, was $8.96 paid in 1973; and in this litigation, the appellants claim that the property has a value of $150,000.

channel 80 feet wide and 10 feet deep had been dredged across it; and that either the port or the contractor had caused one or more dolphins to be erected on it which were periodically used to anchor net–tending barges and other vessels.

The trial court concluded that this work was done in approximately 1957, and thereafter the port was in uninterrupted possession of the property in question and its use thereof had been open, notorious, hostile, exclusive and

under a claim of right made in good faith for over 10 years.[3]

■ Conflicting evidence in the record supports the trial court's findings. Since we are not a fact-finding court, we must therefore accept the findings as verities for the purpose of this appeal even though a persuasive argument can be made that the facts should have been found otherwise. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959). The determinative legal issue is whether the findings sustain the conclusion that the port is entitled to title to the tidelands by right of adverse possession under RCW 4.16.020, the 10-year statute, which we consider to be the determinative statute.

■ In *Hunt v. Matthews,* 8 Wn. App. 233, 505 P.2d 819 (1973), we summarized the legal principles which control in applying this statute to the facts of a particular case:

Were the actions of the one claiming title by adverse possession sufficiently apparent and blatant to give notice to the original title holder that he was being challenged? The acts constituting the warning which establishes notice must be made with sufficient obtrusiveness to be unmistakable to an adversary, not carried out with such silent civility that no one will pay attention. The intention to claim title to an area must be objectively exhibited by the claimant. *Brown v. Hubbard,* 42 Wn.2d 867, 259 P.2d 391 (1953). Uninterrupted, open, notorious, hostile and exclusive possession for 10 years is required. *Krona v. Brett,* 72 Wn.2d 535, 433 P.2d 858 (1967); *El Cerrito, Inc. v. Ryndak,* 60 Wn.2d 847, 376 P.2d 528 (1962); *Rognrust v. Seto,* 2 Wn. App. 215, 467 P.2d 204 (1970). Real property will be taken away from an original owner by adverse possession only when he was or should have been aware and informed that his interest was challenged. *See Roesch v. Gerst,* 18 Wn.2d 294, 138 P.2d 846 (1943).

Whether actions are open, notorious and hostile is a question of fact to be decided by the trier of the fact. *Northwest Cities Gas Co. v. Western Fuel Co.,* 13 Wn.2d

---

[3]Findings of fact labeled conclusions of law will nevertheless be treated as findings of fact. *Redmond v. Kezner,* 10 Wn. App. 332, 343, 517 P.2d 625 (1973).

75, 123 P.2d 771 (1942); *Spear v. Basagno,* 3 Wn. App. 689, 477 P.2d 197 (1970). The decision is made within the context of the locality, the nature and character of the property and the use made of it. *Frolund v. Frankland,* 71 Wn.2d 812, 431 P.2d 188 (1967). When a claimant does everything a person could do with particular property, it is evidence of the open hostility of his claim. If he does less, the trier of the fact is justified in concluding that an owner would not be expected to take alarm from such random activity. *Grays Harbor Commercial Co. v. McCulloch,* 113 Wash. 203, 210, 193 P. 709 (1920). *Hunt v. Matthews, supra* at 236–37.

Here the trial court found all of the elements required to establish title in the port by adverse possession under the statute. *Butler v. Anderson,* 71 Wn.2d 60, 64–65, 426 P.2d 467 (1967); *Hunt v. Matthews, supra.*

The enclosure of the tidelands in question by the port, graphically portrayed in the aerial photograph which is included herein, was complete, open, notorious and in every way appropriate to fit the premises for port purposes. 3 Am. Jur. 2d *Adverse Possession* § 43 (1962); 2 C.J.S. *Adverse Possession* § 36 (1972). In a legal sense, the enclosure "unfurled the flag of hostile ownership." *Drumheller v. Nasburg,* 3 Wn. App. 519, 524, 475 P.2d 908 (1970).

The enclosure was coupled with other acts of use by the port appropriate to the nature and character of the tidelands, such as dredging the channel across it, using fill from it and constructing a dolphin or dolphins on it which were periodically used for vessel moorage. As one port commissioner who had been in office since 1955 testified,

we made all of the use of the tide flats that you could make of any tide flats.

The sum and substance of all of these acts, considered together, were sufficient to establish adverse possession in the port. *Hunt v. Matthews, supra;* 3 Am. Jur. 2d *Adverse Possession, supra;* 2 C.J.S. *Adverse Possession, supra.*

Affirmed.

CALLOW, J., concurs.

Dore, J. (dissenting)—I would reverse and instruct the trial court to commence an inverse condemnation proceeding in order to determine the amount of just compensation the port should pay plaintiff property owners for taking their property. *Martin v. Port of Seattle*, 64 Wn.2d 309, 391 P.2d 540 (1946); Const. art. 1, § 16 (amendment 9).

The trial court sustained the port's claim of adverse possession by finding "that the subject property had been held by the Port of Bellingham, and its use thereof had been open, notorious, hostile, exclusive and under a claim of right made in good faith for over 10 years."

The majority of this court upheld the findings of the trial court saying "conflicting evidence in the record supports the trial court's findings."

I have carefully read the record and find to the contrary. I find no conflicting evidence on the essential facts necessary for us to determine the validity of the port's adverse possession claim.

The undisputed evidence is that the port failed to possess even a single foot of the plaintiffs' property; but rather simply enclosed it on three sides and dug a 10-foot drainage ditch through 80 feet of a 220-foot frontage of the owners' tidelands.

The port, in its brief, states:

> The plaintiffs' Statement of Facts is substantially accurate, however, rather than simply stating the facts, the plaintiffs include certain arguments and conclusions. It is submitted that the facts, as testified to by the witnesses, are not relatively in dispute but it is rather the inferences to be drawn from those facts that are disputed. . . ."

In *Reid Co. v. M–B Contracting Co.*, 46 Wn.2d 784, 793, 285 P.2d 121 (1955), the court gave us the guideline to follow in reviewing such cases:

> [W]here there is no conflict in the testimony and the sole question on appeal concerns the proper conclusions to be drawn from practically undisputed evidence, this court has the duty of determining for itself the proper conclusions to be drawn from the evidence in the case.

*See also McGuire v. United Bhd. of Carpenters, Local 470,* 50 Wn.2d 699, 314 P.2d 439 (1957).

Let us now examine the evidence to determine the undisputed facts that are germane to this review. (The following facts are admitted by the port in its brief.)

1. The owners were assessed and paid the property tax on the subject property during the entire 10 years.

2. The breakwater was constructed entirely on Martin Street and *no portion of the breakwater extends onto the subject property* or even that half of Martin Street which abuts the subject property.

3. The bulkhead was constructed down the center of "H" Street and *no portion of it extends onto the subject property.*

4. The single piling just inside the seaward edge of the property *was not placed there by the Port,* or at its direction, and was never used by the Port. (A witness assumed it was placed there by the breakwater contractor for its convenience.)

5. The channel dredged by the breakwater contractor was for the sole purpose of floating rock barges during construction, was a one–time use and no further use was contemplated; *the Port made no use of the channel, and there was no maintenance or other activity by the Port with regard to the channel until construction of the boat launching ramp in 1970.*

6. The only evidence in the record is that the dredging of the channel was done with the permission of the predecessor in interest of the owners.

7. The subject property abuts the railroad property on the shoreward side, and continues to have the same access across that property it has always had and there is no evidence the Port ever sought to fence the shoreward side of the subject property or otherwise restrict access.

8. The subject property continued to have access by water and the *Port presented no evidence that it ever restricted or sought to restrict access to the property by boat.*

9. While there was vague general testimony occasionally of sporadic moorage by members of the general public to some of the dolphins, the Port's own witnesses admitted: The dolphins used did not include the one on the subject property; such moorage used was only from

the early 60's to 1969; such moorage used during the limited period was sporadic and "there were many, many years when there was nothing there"; the Port exercised no control over such moorage, made no arrangements for it, kept no records of it and collected no rent for it.

10. In 1972 the *Port admitted in writing* after a complete study that the Port had made no use or development of the subject property until the construction of the small boat launching ramp in 1970 or 1971.

(Italics mine.)

The breakwater did not change the owners' access to their property. There is absolutely no evidence that the port ever attempted to restrict boats from coming inside the breakwater or try to prevent boats from entering the channel to the owners' property. Thus, whatever access the owners had by water was not hindered by the breakwater, and in fact was probably improved by the breakwater in the channel. The owners' other means of access to their property prior to construction of the breakwater was across the railroad property which abuts the subject property on the shoreward (easterly) side. That access was not changed by the breakwater. Thus, the breakwater did not "exclude" the owners from their property.

In summary, the port does not dispute the fact that neither the rock breakwater nor the bulkhead touched the owners' property at any point; nor does it dispute that the dredging of the channel through the owners' property was a one–time use, and no further use was contemplated and that the port itself made no further use of the channel. The port further admits that its claim of holding under color of title via a quitclaim deed is not from the owners or their predecessors in interest, but from the City of Blaine, who mistakenly had included it in a conveyance of other property to the port.

Exhibits 13 and 14 were 1972 letters of the port attorney to the property owners and there was no contention at that late date that the port was claiming the property adversely to the property owners, but in fact it was trying to negotiate purchase of the same. It is interesting that the port

attorney admits in his letter that there was no development on the property until 1971 when a small boat launching ramp was placed there by the Port of Bellingham. These letters are short, so they are set forth in their entireties.

Mr. Jack Peeples
c/o Carter's Real Estate Exchange
109 West Champion
Bellingham, Wa 98225

Re: Yelton–Miller Property
(Blaine Harbor)

Dear Jack:

Pursuant to your request, I have had Mr. Ted Scholz, the Port Engineer, make a study of the property that is owned by Yelton and Miller within the Blaine Harbor. I have photos which were taken by the Port of Bellingham in June, 1969, June, 1970 and May, 1971. *The pictures show no development on the property until 1971 when a small boat launching ramp was placed there by the Port of Bellingham.* The boat launching ramp is a non–income producing facility and was built for the convenience of small boat owners. These pictures are available for you to look at any time you wish. Further, you are at liberty to check the records of the Port of Bellingham by simply calling Mr. Tom Glenn, the Manager, and making an appointment.

Obviously, the *Port of Bellingham desires to acquire this property.* As of this date we have had no appraisal made but inasmuch as you and Mr. Miller have had substantial background in real estate appraisals perhaps you could establish your asking price and then submit it to the Port.

Yours very truly,

George Livesey, Jr.
Port Attorney

(Italics mine.)

Mr. John Miller
Edward H. Miller & Co.
1414 Broadway
Bellingham, Wa 98225

Mr. Jack Peeples
c/o Ted R. Carter Realty
109 West Champion Street
Bellingham, Wa 98225

Re: Port of Bellingham—Blaine Property

Gentlemen:

I have been authorized by the Port of Bellingham to offer the Miller heirs and Yelton heirs $23,500.00 for the property at Blaine which is presently used by the Port of Bellingham.

This offer is based upon an appraisal made by Hal G. Arnason, Jr. I only have one copy of the appraisal and I am sending that to Mr. Peeples.

I sincerely hope that this matter can be resolved in the near future based upon this offer. The Port of Bellingham is ready to close this transaction promptly.

Yours very truly,

George Livesey, Jr.
Port Attorney

As late as 1972 the Port's letters conclusively showed that the Port recognized the plaintiffs' ownership and made no claim to it, but in fact wanted to buy it. Where is the "hostility" to such ownership, one of the key elements of an adverse possession action?

In *Wood v. Nelson*, 57 Wn.2d 539, 358 P.2d 312 (1961), the court in quieting title found the disputed line fence was on the appellant's property, stating at pages 540–41:

It is *possession* that is the *ultimate fact* to be ascertained. *Exclusive dominion over land is the essence of possession*, and it can exist in unused land if others have been excluded therefrom. A fence is the usual means relied upon to exclude strangers and establish the dominion and control characteristic of ownership.

. . .

Where a fence purports to be a line fence, rather than a random one, and when it is effective in excluding an abutting owner from the unused part of a tract otherwise generally in use, it constitutes *prima facie* evidence of hostile possession up to the fence.

(Some italics mine.) However, in the subject case, the breakwater did not purport to be a line fence between the port and the owners, and it did not exclude the plaintiffs or anyone else from the property. As the undisputed facts show, the port never possessed the subject property, but at best enclosed and/or encircled it. However, even the enclosing was not hostile and/or exclusive, for the port recognized the ownership in others from whom they offered to purchase it.

Our Washington State Supreme Court has held that mooring a floating structure on tidelands is not such open, notorious and hostile possession as would give notice that someone is adversely possessing the property. *Bowden–Gazzam Co. v. Kent,* 22 Wn.2d 41, 154 P.2d 292 (1944); *Adamec v. McCray,* 63 Wn.2d 217, 386 P.2d 427 (1963). These cases control this case.

The port's "color of title" claims are contingent upon first establishing there has been an adverse possession of some portion of the property for at least 10 years prior to the commencement of this action. "Color of title", without adverse possession in its full requirements for the statutory period, establishes no interest and the undisputed facts prohibit the Port of Bellingham from showing adverse possession of the owners' property for the statutory 10–year period.

Under the rationale of the majority, waterfront owners of property should be leery of any neighbor who might secure ownership of property on three sides of their shore property and begin dredging activities through the tidelands on the waterfront side. Under the majority opinion, such neighbor could commence adverse possession proceedings in 10 years. Apparently the only showing they would have to make to establish adverse possession is that they enclosed their neighbor's property for 10 years.

Does this sound silly? It shouldn't for that's exactly what the port did in the subject case. It enclosed the plaintiffs' property on three sides (but never possessed a foot of it), and on the waterfront side dug an 80–foot trench, waited

for 10 years, and the majority now say that the port owns the plair tiffs' property by way of adverse possession.

As the evidence in the record totally failed to support the findings of fact of the trial court as to the subject property being held by the port in an actual, uninterrupted, open, notorious, hostile and exclusive possession, the port's judgment should be reversed.

I would remand to the trial court with instructions to commence a trial of inverse condemnation to determine the amount of just compensation that the port should pay the property owners for taking their property.

Reconsideration denied April 5, 1979.

Review granted by Supreme Court July 20, 1979.