[No. 46255. En Banc. June 26, 1980.]

BLANCHE O. PEEPLES, ET AL, *Petitioners,* v. THE
PORT OF BELLINGHAM, ET AL, *Respondents.*

*Sam Peach, Bogle & Gates, Robert W. Graham,* and *Ronald T. Schaps,* for petitioners.

*McCush, Kingsbury, O'Connor, Ludwigson, Thompson & Hayes,* by *John S. Ludwigson,* for respondents.

WILLIAMS, J.—Petitioners, titleholders of 2 1/2 acres of Blaine Harbor tidelands, seek review of a Court of Appeals decision affirming the trial court's judgment quieting title in the Port of Bellingham by adverse possession. *Peeples v. Port of Bellingham,* 21 Wn. App. 821, 588 P.2d 757 (1978). We reverse.

The record in this case reveals the following undisputed facts:

In 1946, the tidelands in question were purchased at a tax sale by petitioners' predecessors in interest. Petitioners were assessed and paid property taxes on the subject property during the 10–year period prior to this action. The property abuts railroad property on the shoreward (easterly) side. Platted but undeveloped streets run along the southeasterly and northwesterly edges of the property.

By quitclaim deed in 1956, the City of Blaine conveyed these tideland lots along with adjacent ones to the Port of Bellingham, in contemplation of a major improvement program to Blaine Harbor. The improvement program, which

was begun in 1957, envisioned an expansion of Blaine Harbor and ownership of the entire harbor area by the Port of Bellingham.

The accompanying 1962 aerial photograph (Exhibit 23) illustrates the harbor area with improvements; the tidelands in question appear as marked in the upper right hand corner.

As part of the 1957 improvement program, the port constructed a rock breakwater down the southeast side of the subject property on platted but undeveloped Martin Street. No portion of the breakwater was placed on the subject property or on the half of Martin Street that abuts the property.

The port also constructed a bulkhead down the center of platted but undeveloped "H" Street on the northwest side of the property. The trial court found that no portion of the bulkhead or the fill deposited behind it was placed on the property, but merely ran along the northerly side of the tract. Finding of fact No. 12.[1]

There was a line of dolphins or piles parallel to and about halfway between Martin Street and "H" Street. The surveyor's map revealed that one of the dolphins was located just inside the seaward edge of the property; the others were outside the seaward boundary. It was the recollection of the port manager that the port did not install the dolphins or have them installed, nor did it make any use of them. A port commissioner was not sure, but thought

---

[1]The port referred to "vacated" "H" Street in its response to the petition for review in this court. The trial court made no finding regarding the validity of the alleged street vacation. Nor did the court refer to "vacated" "H" Street in its oral opinion; indeed, the opinion implies that the bulkhead did not touch the subject property, a result consistent with the formal findings. The port made no mention of the street vacation in its brief to the Court of Appeals and in fact admitted that no portion of the bulkhead was placed on the subject property. Brief for Respondent at 2. The Court of Appeals, in affirming the trial court, did not discuss any street vacation at all. Under these circumstances, we decline to comment upon the alleged vacation.

the dolphins might have been put in during construction of the breakwater.

The breakwater contractor dredged an 80–foot channel through part of the subject property in order to float in rock barges. The dredging was a "one–time" use and no further use was contemplated. The port made no further use of the channel, though sporadic use was made by fish-

ing boats as winter moorage. There was no agreement between the port and boat owners as to this moorage, which apparently occurred intermittently between 1957 and 1970. The port manager testified: "[T]here were many, many years when there was nothing there."

In connection with consideration of a proposed development in 1966, the port learned that it did not own the subject property. In 1970, the port began construction of a boat launch ramp and related facilities on the subject property.

On May 31, 1972, the port's attorney wrote the owners that the port engineer had done a study which showed there had been no development of the property until 1971 when the port completed the boat ramp. The letter also stated: "Obviously, the Port of Bellingham desires to acquire this property. . . . [P]erhaps you could establish your asking price and then submit it to the Port." Exhibit 13. An appraisal was made to which the parties did not agree. This litigation ensued in 1974, each side seeking to quiet title to the property.

Following a nonjury trial, the trial court entered judgment concluding the port had established all the requisite elements of adverse possession and quieting title in the port. By a split decision the Court of Appeals affirmed the judgment. *Peeples v. Port of Bellingham, supra.*

Simply stated, the issue on review is: Does the evidence support the conclusion that the port has acquired title by adverse possession?

A majority of the Court of Appeals panel upheld the trial court, stating that

> Conflicting evidence in the record supports the trial court's findings. Since we are not a fact–finding court, we must therefore accept the findings as verities for the purpose of this appeal . . . *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

*Peeples,* at 824.

The port contends that (1) adverse possession is an issue of fact, (2) there was conflicting evidence which the trial court weighed, and (3) *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959), requires a reviewing court to affirm the trial court's conclusion if it is supported by substantial evidence.

In a long line of cases, Washington courts have stated that adverse possession is an issue of fact. *See, e.g., Jacobsen v. State,* 89 Wn.2d 104, 111, 569 P.2d 1152 (1977); *Hill v. L.W. Weidert Farms, Inc.,* 75 Wn.2d 871, 874, 454 P.2d 220 (1969); *Bepple v. Reiman,* 51 Wn.2d 144, 149, 316 P.2d 452 (1957); *Murray v. Bousquet,* 154 Wash. 42, 49–50, 280 P. 935 (1929); *McAuliff v. Parker,* 10 Wash. 141, 143, 38 P. 744 (1894); *Diel v. Beekman,* 7 Wn. App. 139, 149, 499 P.2d 37 (1972); *Spear v. Basagno,* 3 Wn. App. 689, 690, 477 P.2d 197 (1970). It is more accurate, however, to say that adverse possession is a mixed question of law and fact. Whether the essential facts exist is for the trier of fact; but whether the facts, as found, constitute adverse possession is for the court to determine as a matter of law. *See, e.g., Robin v. Brown,* 308 Pa. 123, 126, 162 A. 161 (1932); *Smith v. Vermont Marble Co.,* 99 Vt. 384, 395–96, 133 A. 355 (1926); 2A C.J.S. *Adverse Possession* § 301 (1972). Thus, it is ordinarily within the province of the trier of fact to determine from conflicting evidence the existence of facts necessary to constitute adverse possession, and such factual findings will not be disturbed on appeal when they are amply sustained by the record. *Hill,* at 874; *Thorndike,* at 575.

The *Thorndike* rule, cited by the port as controlling in the present case, applies in cases where there is a factual dispute. *Thorndike,* at 575; *see also Fischler v. Nicklin,* 51 Wn.2d 518, 524, 319 P.2d 1098 (1958). We have explained that the rule is

based upon the theory that there is a conflict in the testimony and that the trial court, having the witnesses before it, is in better position to arrive at the truth than is the appellate court. For this reason, the rule has no application in a case where there is no substantial dispute as to the facts and no question as to the credibility of witnesses or the weight to be given to their testimony, but where the sole question on appeal concerns the proper conclusions to be drawn from practically undisputed evidence; in such situation, this court has the duty of determining for itself the right and proper conclusions to be drawn from the evidence in the case.

*Shultes v. Halpin,* 33 Wn.2d 294, 306, 205 P.2d 1201 (1949). *See also W.L. Reid Co. v. M–B Contracting Co.,* 46 Wn.2d 784, 793, 285 P.2d 121 (1955).

In its brief to the Court of Appeals, at page 1, the port admitted that the present case was not one of conflicting evidence:

It is submitted that the facts, as testified to by the witnesses, are not relatively in dispute but it is rather the inferences to be drawn from those facts that are disputed.

The record likewise confirms that the parties agree on the essential facts relevant to a claim of adverse possession. Thus, *Thorndike* is inapplicable, and the issue is purely a question of law: whether the undisputed findings of fact sustain as a matter of law the conclusion that the port is entitled to title of the tidelands by right of adverse possession. *Shultes,* at 306; *Reid Co.,* at 793.

■ To establish a claim of adverse possession, the possession must be open and notorious, actual and uninterrupted, hostile, exclusive and under a claim made in good faith. *Muench v. Oxley,* 90 Wn.2d 637, 584 P.2d 939 (1978). The necessary period of possession is 10 years. RCW 4.16-.020. However, one who possesses under color of title and who pays legally assessed taxes for 7 successive years may bring an adverse possession action at the end of the 7–year period. RCW 7.28.070.

The burden of proving each element of adverse possession is on the claimant. *Muench,* at 642. *Hunt v. Matthews,* 8 Wn. App. 233, 238, 505 P.2d 819 (1973). The presumption of possession is in the holder of legal title; "[h]e need not maintain a constant patrol to protect his ownership." *Hunt,* at 238.

The trial court concluded, and the Court of Appeals agreed, that the subject property in the present case had been uninterruptedly possessed by the port and that its use had been open, notorious, hostile, and exclusive, and held under color of title for more than 10 years. We disagree for the following reasons:

1. At no time does the evidence reveal that the port had exclusive possession of the subject property. Neither the breakwater nor the bulkhead touched the property. The port did not restrict access from the easterly (railroad) side by building a fence or other barrier. Moreover, no evidence was presented that the port limited access by boat to the property, which was physically accessible at all times.

2. There was not continuous use by the port. The channel dredged in 1957 by the breakwater contractor appears to have been a one–time use for the purpose of floating rock barges during construction. There is no evidence that the port made any further use of the channel until 1970. What use there was of any of the dolphins, including the single one inside the seaward line of the subject property, appears to have been sporadic use *by the general public,* not the port. The port exercised no control over any moorage, made no arrangements, and collected no rent.

In addition, in 1972, the port admitted in writing that there was "no development on the property until 1971 when a small boat launching ramp was placed there by the Port of Bellingham." Exhibit 13. Such an admission appears to conflict with the port's position that it had made continuous use of the property since 1956.

3. We have held that the mooring of a floating structure on tidelands is not such an open, notorious, and hostile possession as would give notice to an owner that

someone was claiming title adversely. *Bowden–Gazzam Co. v. Kent,* 22 Wn.2d 41, 54, 154 P.2d 292 (1944); *Bowden–Gazzam Co. v. Hogan,* 22 Wn.2d 27, 40, 154 P.2d 285 (1944). Thus, even if the port used as moorage the one dolphin inside the seaward edge of the property line, such use by itself would not establish the requisite possession. In fact, there was no evidence that the dolphin had been placed there by the port, nor that it had ever been used by the port.

4. As to the element of hostility, the only evidence adduced in the record indicates that the owner gave his permission for the one–time dredging operation. Although testimony on this point was hearsay, and beyond the scope of the question, it does not appear from the record that the court ruled on the objection. Moreover, the port did not move to strike the testimony, nor did it thereafter attempt to present contradicting evidence. Under such circumstances, the testimony is proper evidence which we may consider. *Callen v. Coca Cola Bottling, Inc.,* 50 Wn.2d 180, 182–83, 310 P.2d 236 (1957); *Merritt v. Department of Labor & Indus.,* 41 Wn.2d 633, 636, 251 P.2d 158 (1952).

In addition, the findings confirm that the port learned in 1966 that its title was defective and in 1972 initiated negotiations to purchase the property. On May 31, 1972, the port's attorney wrote to petitioner Peeples' husband and manager of her property:

Mr. Jack Peeples
c/o Carter's Real Estate Exchange
109 West Champion
Bellingham, Wa. 98225

Re: Yelton–Miller Property
(Blaine Harbor)

Dear Jack:

Pursuant to your request, I have had Mr. Ted Scholz, the Port Engineer, make a study of the property that is *owned by Yelton and Miller* within the Blaine Harbor. I have photos which were taken by the Port of Bellingham in June, 1969, June, 1970 and May, 1971. The pictures

show no development on the property until 1971 when a small boat launching ramp was placed there by the Port of Bellingham. The boat launching ramp is a non–income producing facility and was built for the convenience of small boat owners. These pictures are available for you to look at any time you wish. Further, you are at liberty to check the records of the Port of Bellingham by simply calling Mr. Tom Glenn, the Manager, and making an appointment.

Obviously, the Port of Bellingham *desires to acquire this property.* As of this date we have had no appraisal made but inasmuch as you and Mr. Miller have had substantial background in real estate appraisals perhaps *you could establish your asking price* and then submit it to the Port.

Yours very truly,

George Livesey, Jr.
Port Attorney

(Italics ours.) Exhibit 13.

██ The port made no claim to ownership; indeed, it *admitted* ownership in petitioners or their predecessors in interest. Nor did the port assert or even imply a claim to a superior title in itself. These facts suggest that there is not a 10–year period in which the port had a good faith claim to the property. Where a claimant recognizes a superior title in the true owner during the statutory period, we have held the element of hostility or adversity is not established. *Roesch v. Gerst,* 18 Wn.2d 294, 306–07, 138 P.2d 846 (1943).

> If one . . . enters under a claim of right or title made in good faith, but at any time during the statutory period recognizes a superior title in the true owner and his continued possession is in subordination to such title, such possession is not regarded as adverse and will not ripen into a title. *Roesch v. Gerst, supra.*

*State v. Stockdale,* 34 Wn.2d 857, 862, 210 P.2d 686 (1949).

However, the port relies on *Stockdale* for the proposition that hostility and good faith are not lost if, after entering

into possession under a good faith claim, the adverse possessor learns that someone else has superior title and initiates negotiations to purchase the property. In *Stockdale,* the claimant State of Washington had actively used the subject property, constructing extensive improvements on the 10–acre tract and making the improvements a focal point of the state park which surrounded the disputed property. In concluding that negotiations to purchase did not impair adversity, the court appeared to limit the rule to the facts of that case. After explaining the usual rule, quoted above, the court said:

> These rules of law are not applicable to the facts as we find them to be. Whatever cessation there may have been in the making of improvements in the park . . . during the ten–year period after possession was taken, does not establish the fact or justify the conclusion of law that the respondent [state] either recognized a superior title or continued in possession in subordination thereto. The negotiations had with a view of perfection of title rather than indulging in litigation, did not operate as an interruption of the adverse possession.

(Citation omitted.) *Stockdale,* at 862. Insofar as it related to negotiations for purchase, the decision focused on the interruption in respondent's active *use* of the property, rather than any discontinuity in its claim to title.

In our view, however, the proper analysis of the element of hostility must be whether the claimant recognizes that another party has superior title. Where as here there is no language asserting a superior interest, negotiations to purchase the property are evidence that a claimant views his own title as subordinate. *Roesch.* To the extent *Stockdale* holds otherwise, it must be limited to its facts.

In the present case, the port admitted it desired to acquire the tidelands, commissioned an appraisal, and made an offer to some of the petitioners to purchase the property. These acts amply demonstrate that the port recognized ownership in those from whom they offered to purchase the property. The requisite hostility was clearly absent.

■ 5. In order to gain title to property held under "color of title," a claimant must have more than a claim made in good faith. RCW 7.28.070, .080. The statute requires not only "actual, open and notorious possession of lands", but also payment of legally assessed taxes for 7 years in succession. RCW 7.28.070. Not only did the port not pay the taxes, but as we have noted the other elements of possession were not clearly established. "It is *possession* that is the ultimate fact to be ascertained. Exclusive dominion over land is the essence of possession, . . ." *Wood v. Nelson*, 57 Wn.2d 539, 540, 358 P.2d 312 (1961). The port has not demonstrated its exclusive, actual, or hostile dominion over the tidelands in question.

From all the foregoing, it is manifest that the port has not shown acts sufficient to take title in adverse possession. Accordingly, the judgment of the Court of Appeals is reversed.

ROSELLINI, STAFFORD, WRIGHT, BRACHTENBACH, HORO-WITZ, DOLLIVER, and HICKS, JJ., and HAMILTON, J. Pro Tem., concur.