# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

VAN NHU HUYNH ,

          Respondent,

   v.

LEUNG HING LI,

          Appellant.

No. 78417-0-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: October 7, 2019

ANDRUS, J. — Leung Hing Li appeals a trial court ruling that his ex-wife, Van Nhu Huynh, adversely possessed a Seattle home that Li and Huynh owned as cotenants.[1] Li contends Huynh failed to prove she ousted him from this property because she confirmed their equal ownership after she demanded he leave. Li also challenges the trial court's determination that after their divorce, Li had no ownership interest in a business known as Asia Discount Center.

We conclude that substantial evidence supports the trial court's factual findings of adverse possession and ownership of Asia Discount Center. We affirm.

## FACTS

Van Nhu Huynh immigrated to the United States as a refugee from Vietnam in 1980. Later the same year, she married Leung Hing Li. Shortly before the marriage, in 1979, Li purchased a home at 4431 Letitia Ave. S. (hereafter the

---

[1] This is Li's second appeal. In 2016, this court reversed summary judgment in Huynh's favor, concluding there were genuine issues of material fact as to whether Huynh had ousted Li from the property. Huynh v. Li, No. 73457-1, slip op. at 10 (April 25, 2016).

"Letitia property"). Li paid a down payment of $7,500 toward the purchase price of $51,000, and financed the remainder. The Letitia property was the couple's home for well over a decade. During their marriage, the marital community made the mortgage payments and paid for maintenance, repairs, upkeep, insurance, and taxes.

Li and Huynh started three businesses during their marriage, two of which are relevant to this case: Asia Discount Center, which sold various goods and groceries imported from Asia, and United Imports, which imported and sold Asian furniture.

In 1987, Li hired an attorney to represent him in obtaining a divorce. Li filed a petition for dissolution in May 1987, but he dismissed it in June in order to close the purchase of property located at 3015 Beacon Avenue South in Seattle. Li testified he used community assets to acquire the Beacon Avenue property. A month later, at the end of July, 1987, he re-filed for divorce, submitting essentially the same petition. Neither of Li's petitions listed any of the parties' real property or United Imports. The final decree, entered in November 1987, indicated that the parties did not own any real property and did not list United Imports as an asset to be divided in the dissolution. The decree identified Asia Discount Center as community property and provided that the parties were to sell it and divide the proceeds equally.

Huynh did not have an attorney for the dissolution and the trial court found she did not understand the contents of it. Huynh testified, and the court found, that the parties agreed she would take Asia Discount Center, and Li would take United

2

Imports. The trial court explicitly found that Huynh's testimony regarding the parties' divorce and the circumstances related to that proceeding to be credible.

The court also found that the parties did not follow the divorce decree in their conduct and neither of them sought to enforce it. But as of 1988, the parties ran their own respective separate businesses and maintained separate financial lives. They owned separate bank accounts, filed separate federal income tax returns, and acquired separate properties and assets, even though they continued to live in the same house, maintained some joint financial accounts, and purchased certain real properties together as "husband and wife" until 1992. Huynh and Li lived in the same house until 1997.

In September 1988, Li and Huynh purchased property at 1725 Victoria Ave. SW (hereafter the "Victoria property") for $178,000. Of that amount, Asia Discount Center paid just under $54,000, and Huynh personally paid $45,000. Another $30,000 was paid from accounts Li and Huynh held jointly. The remaining $50,000 was financed.

In 1989, Huynh began the process of removing Li's name from Asia Discount Center's licenses and government registrations. With the help of her sister, Jenny Wong, she obtained a new master business license for Asia Discount Center, and ultimately, in 1993, formed a new corporate entity, Asia Discount Center, Inc., which she owned exclusively.

In 1991, Huynh and Wong purchased property at 2367 13th Ave. (hereafter the "13th Ave. property"). The purchase price was $75,000, of which $45,000 was seller financed. Huynh and Wong made the down payment of $30,000. Although

Li contributed nothing toward the purchase of the 13th Ave. property, he was named on the title with Huynh and Wong.

In 1992, Li and Huynh jointly borrowed $100,000 to rebuild the Victoria property. The loan was secured by the Letitia property. At this point, Li also quitclaimed his interest in the Letitia property to both parties, as "husband and wife."

After the divorce, Li began looking to marry someone else. In 1990, when Li, Huynh, and their children were on a trip to China, Li introduced Huynh to a young woman he identified as the daughter of a relative. In fact, she was a woman Li was considering marrying.

In 1993, Li brought a woman, identified as his fiancée, from China. At that point, Huynh confronted Li about the Letitia home and other real properties they had acquired as "husband and wife" after their divorce. Huynh testified that at that point, Li agreed to have the properties transferred into her name only, so she hired an attorney to prepare appropriate documents for Li to sign. Li did not sign the documents, however. The attorney then helped Huynh incorporate Asia Discount Center, Inc.

In 1995, Li remarried in China without telling Huynh he had remarried. The two continued to live together in the Victoria house until 1997 when Li disclosed his marriage to Huynh. Huynh, heartbroken by his deception, confronted Li about her prior requests that he transfer title to three properties to her, kicked him out of the Victoria property, told Li that he could not come back and that she intended to change the locks. Li packed his personal belongings and left Seattle. Huynh's brother changed the locks at the Victoria and Leticia properties, and Huynh installed a wire fence around the 13th Ave. property to prevent anyone from entering.

4

Not long after Huynh kicked Li out of the Victoria property, Li and his new wife left Seattle, lived for a time in Los Angeles, and ultimately settled in New York. Li did not return to Seattle until 2012, when Li filed this action.

In 1998, Huynh sent Li some property expense information for the Victoria and Letitia properties. Huynh's handwriting on this document indicated that Li owned 50% of each of these properties. Beginning with tax year 1999, however, the court found that Huynh refused to provide Li income and expense information for these two properties. Li requested this information from Huynh in 1999 and she refused to provide it. In addition, Li admitted at trial that he asked Huynh to send him money after he had moved to New York, but she refused.

In 2011, Huynh's attorney sent Li a letter asking him to sign quitclaim deeds transferring to Huynh his interest in the properties they owned jointly. Li refused to sign the quitclaim deeds.

Huynh brought this lawsuit in 2012 seeking to quiet title in the Victoria, Letitia, and 13th Avenue properties. Li filed a counterclaim for partition of these three properties and an accounting of rent and income from these properties and income from Asia Discount Center and United Imports.

After a five-day bench trial, the court held, in relevant part, that Huynh proved by clear, cogent, and convincing evidence that she had ousted Li from the Victoria property in 1997, that she acted consistently with ouster in subsequent years, and that she had established all the elements of adverse possession against Li as a cotenant. The court quieted title to the Victoria property in Huynh.

With respect to the Letitia and 13th Ave. properties, the court concluded that Huynh had not proved ouster or that Li was on notice that he had no interest in the

5

properties. The court noted that even though it found Huynh's testimony to be credible, there remained an indication that Li was not fully on notice that those properties were no longer his, or that he had no interest in them.

After further briefing, the trial court entered supplemental findings that Li had contributed nothing to the purchase or the payment of expenses relating to the 13th Ave. property and determined his ownership interest to be 0%. The trial court quieted title to that property in Huynh and her sister, Jenny Wong. It further found Li's ownership interest in the Letitia property to be 40% and Huynh's interest to be 60%. It also awarded Huynh reimbursement for insurance, mortgage payments, taxes, and necessary repair expenses she incurred to preserve the Letitia property from 1997 to the present. In April 2018, the trial court found that Huynh was entitled to reimbursement of $70,269.48 against Li's share in the Letitia property. The court appointed a referee to sell the Letitia property.

Li appeals only the trial court's rulings relating to the Victoria property and Asia Discount Center.[2]

## ANALYSIS

### Standard of Review

To establish adverse possession, Huynh had to demonstrate that her possession of the Victoria property was (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile for the statutory 10-year period.

---

[2] Li's notice of appeal listed an October 26, 2017 Order on Statutes of Limitations, Supplemental Findings of Fact and Conclusions of Law dated March 12, 2018, and the April 16, 2018 Order Approving Accounting and Determining Reimbursement. Li, however, did not assign error to any of these rulings. Li's failure to assign error to or to brief any issues in these trial court orders constitutes an abandonment or waiver of any appeal of these orders. Jackson v. Quality Loan Serv. Corp., 186 Wn. App. 838, 845-846, 347 P.3d 487 (2015).

Chaplin v. Sanders, 100 Wn.2d 853, 857, 676 P.2d 431 (1984); RCW 4.16.020. To prove hostile possession, a cotenant claiming adverse possession against another cotenant must establish "ouster." Thor v. McDearmid, 63 Wn. App. 193, 207, 817 P.2d 1380 (1991). Ouster occurs when a cotenant obtains sole possession of the land that is adverse to the other cotenant, where the cotenant repudiates or disavows the relation of the cotenancy or where the tenant without possession is aware of actions by the tenant in possession that signify her intention to hold, occupy, and enjoy the premises exclusively. Yakavonis v. Tilton, 93 Wn. App. 304, 308, 968 P.2d 908 (1998). Evidence of an ouster must be "clear, unequivocal, unmistakable or convincing." Thor, 63 Wn. App. at 207.

Trial court findings on the elements of adverse possession are mixed questions of law and fact. Petersen v. Port of Seattle, 94 Wn.2d 479, 485, 618 P.2d 67 (1980). Whether the essential facts exist is for the trier of fact; but whether those facts, as found, constitute adverse possession is for this court to determine as a matter of law. Peeples v. Port of Bellingham, 93 Wn.2d 766, 771, 613 P.2d 1128 (1980), overruled on other grounds by Chaplin v. Sanders, 100 Wn.2d 853, 863, 676 P.2d 431 (1984).

As to the trial court's factual findings, we review whether substantial evidence supports any challenged findings. Harris v. Urell, 133 Wn. App. 130, 137, 135 P.3d 530 (2006). Substantial evidence exists when there is a sufficient quantity of evidence to persuade a fair-minded, rational person of the truth of the finding. Id. This standard is deferential and requires the court to view the evidence and reasonable inferences in the light most favorable to the party who prevailed in the trial court. State v. Living Essentials, LLC, 8 Wn. App. 2d 1, 14, 436 P.3d 857

(2019) (citation and quotation marks omitted). We do not weigh the evidence or the credibility of witnesses. In re Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973).

## Failure to Assign Error to Trial Court Findings

Huynh argues Li cannot challenge any of the trial court's findings because Li failed to assign error to any of them. RAP 10.3(g) requires separate assignments of error for each challenged finding and also requires that each assignment include a reference to the finding by number. Li failed to comply with either requirement of RAP 10.3(g). We ordinarily treat unchallenged findings of fact as verities on appeal. Merriman v. Cokeley, 168 Wn.2d 627, 631, 230 P.3d 162 (2010).

Li, in his reply brief, asks this Court to allow him to assign error to four findings of fact: Finding of Fact #25 on the issue of ouster, and Findings of Fact #10, #11, and #14, on the issue of Li's interest in Asia Discount Center. He contends his opening brief adequately identified these findings as being unsupported in the record. In appropriate circumstances, we have waived technical violations of RAP 10.3(g), especially where an appellant's brief makes the nature of the challenge clear. Harris, 133 Wn. App. at 137. We conclude that Li's opening brief adequately identified the findings he challenges and we will waive his technical violation of the rule.

## Li's Ouster from the Victoria Property

Li challenges the trial court's legal conclusion that Huynh ousted him from the Victoria property. Li does not challenge the trial court's findings that when Huynh learned in 1997 that Li had remarried, she kicked him out of the house, told him to remove all of his possessions, told him not to return and that she intended

to change the locks. Li also does not challenge the finding that he never returned to the home. As to Huynh's actions in the years following the 1997 incident, he challenges only Finding of Fact #25 in which the trial court found:

> In 1998 Huynh sent Li the property expense information for 1997 for the Victoria and Letitia properties stating that Li owned 50% of Victoria and 50% of Letitia. Starting from tax year 1999, Huynh refused to provide income/expense information for the Victoria property and the Letitia Property to Li for Li's federal income tax reporting.

Li argues that the evidence establishes that Huynh sent tax reporting information to Li for two years, not just one, after the 1997 incident, and she handwrote on this documentation that Li held a 50% ownership interest in the property. He contends Huynh's actions in sending him this paperwork render it impossible for her to demonstrate ouster by clear, unequivocal, or unmistakable evidence.

We conclude substantial evidence supports Finding of Fact #25. Huynh testified, and the court found, that after their divorce in 1987, she and Li filed separate income tax returns. She stated that in the 1990s she sent Li a breakdown of expenses and income for the Letitia and Victoria properties for him to report on this tax returns. In 1997, when Huynh kicked Li out of the Victoria house, she told him the property was no longer his. She told him of her intent to change the locks and did, in fact, change the locks.

After this incident, Huynh sent Li a two-page document with 1997 income and expense information for the Letitia rental property on one page and deductible expenses for the Victoria properties on the second page. Li testified he received this information in April 1998. Huynh testified she sent the document because she was unclear whether she should give Li the information for him to report on his tax

9

return. She testified that when Li called her in 1999 to ask her for the information for the 1998 tax year, she refused to provide it. Starting in 1999, Huynh reported all of the income and expenses for both the Letitia and Victoria properties on her own tax returns and refused to provide Li the information he needed to report any of it on his own tax returns. This testimony supports Finding of Fact #25.

Second, we conclude the trial court's findings support the legal conclusion that Huynh ousted Li from the Victoria property. Mere exclusive possession will not ripen into title by adverse possession. McKnight v. Basilides, 19 Wn.2d 391, 394, 143 P.2d 307 (1943). But a cotenant's sole possession combined with any act or conduct demonstrating intent to hold and occupy the property exclusively, so long as the other cotenant has knowledge or sufficient information to put him on notice to inquire, constitutes ouster. Id. at 395. Huynh had sole possession of and lived in the home on the Victoria property from 1997 to the date of trial. Huynh repudiated the relation of the cotenancy by telling Li the property belonged solely to her. And Li was aware that Huynh intended to hold, occupy, and enjoy the premises exclusively, because she told him that he could not return and that she considered the property to be her sole property, and because after 1997, she did not give him the information he would need to deduct expenses related to the Victoria property on his tax returns.

Li contends that Huynh's 1998 note on the income and expense document she sent to Li—a note that read "Huynh 50% + 50% Li"—constituted an acknowledgment that the parties continued to be cotenants. He argues that the act of sending this document to him, after the 1997 incident, effectively negated Huynh's ouster of him from the property the prior year. We disagree. The course

10

of conduct between these parties before and after the 1997 incident unequivocally demonstrated that Huynh had repudiated their cotenancy relationship and that Li was aware of this repudiation.

First, Huynh demanded that he quitclaim the property to her in 1993 when Li brought a fiancée home from China. Huynh explained to Li that she did not want to have a new wife claiming an interest in property she was paying for and maintaining. Huynh testified Li agreed to this proposition. Huynh sought out counsel to assist her in preparing quitclaim deeds for Li to sign. Li did not refuse to sign them; he simply kept putting Huynh off, and never did sign them. The court found Huynh's testimony about the confrontation with Li about his fiancée to be credible.

Second, when Huynh learned Li had remarried in China in 1995 and had hidden this fact from her, she reminded him he had agreed to quitclaim the property to her. She told him that she was not going to give him any of the properties, even if he did not agree to transfer them to her legally. Li packed his belongings and left Seattle when she demanded he leave the Victoria home, and he never returned. Over the course of the next 15 years, the two spoke perhaps three or four times on the telephone.

Third, although Huynh sent Li tax information for the property in 1998, she refused to do so thereafter. Rather than acknowledging his ownership interest, Huynh made it clear no later than 1999 that she considered the property hers. The ouster that started in 1997 was completed by 1999, well within the ten-year adverse possession time period. The single notation on a single document, delivered to Li

in 1998, does not overcome the clear and unequivocal nature of Huynh's declaration of sole ownership made both before and after she sent him that note.

Finally, Li contends that Huynh's request in 2011, through counsel, that he quitclaim his interest in the Victoria property to her was another acknowledgement that they remained cotenants of the properties. Li relies on Shull v. Shepherd, 63 Wn.2d 503, 506, 387 P.2d 767 (1963) for the proposition that one party's request that the other transfer his interest reflects a recognition that the cotenant has an ownership interest. Shull is factually distinguishable. In that case, a couple living together in a meretricious relationship purchased a home as husband and wife. Shull, 63 Wn.2d at 504. Both contributed money toward the purchase of the property and the payment of the mortgage. After they separated, the husband offered to purchase the wife's interest in the property for $800. She refused. Thereafter, the husband continued to live in the home and pay the mortgage. Id. After trial, the court found that the husband's offer to purchase the wife's interest in the property was not an unequivocal disavowal of the wife's ownership interest and rejected the argument that he had ousted her from the property. Id. at 506. This court affirmed these findings as supported by the record. Id.

Here, Huynh's request that Li quitclaim his interest in 2011 was not accompanied by an offer to pay him anything for this interest. Huynh continued to insist, as she had since 1997, that Li acknowledge the property belonged solely to her. Moreover, unlike in Shull, Huynh had orally expressed her intent to own the Victoria property exclusively. Her request in 2011 reflects a desire to eliminate the cloud on her title, not a recognition of Li's cotenancy. This evidence supports the trial court's finding that Huynh's conduct after 1997 was consistent with ouster. We

therefore affirm the trial court's determination that Huynh took title to the Victoria property through adverse possession.

Li's Ownership Interest in Asia Discount Center

Li challenges the trial court's finding that when the parties divorced, he relinquished his interest in one of the couple's businesses, Asia Discount Center. He relies on the divorce decree that required the parties to sell the business and split the proceeds of that sale.

But the trial court found that Huynh, who does not speak English, did not understand the decree. Li did not list all of their assets and liabilities in the dissolution petition and the parties did not follow the decree in their own conduct. Instead, the court found Huynh's testimony credible that they agreed that she would take Asia Discount Center, the grocery business, and he would take United Imports, the furniture business. And in the years following the divorce, they each ran their own separate businesses.

The record supports these findings. First, Huynh, her sisters, and her daughter all testified that after the divorce, Li never worked at Asia Discount Center, never participated in the management of it, never received any compensation or income from the business, and never asked to review any profit and loss information. Huynh presented her own K-1s from the business and demonstrated that she had in fact reported all of the income from the business on her own personal tax returns. The first time Li claimed an interest in Asia Discount Center was in 2014, two years after Huynh filed the quiet title action.

Second, Huynh testified she began taking steps to remove Li's name from the business paperwork shortly after the divorce. In 1989, with her sister's help,

13

Huynh successfully removed Li's name from all government permits and licenses for the business. Finally, Huynh received no income from United Imports after the divorce. She testified that while she helped Li out in that business, she did so only because she hoped they might reconcile. She reported no income from that business on her separate tax returns.

This evidence supports the trial court's findings that the parties agreed to divide their businesses to give Huynh sole ownership of Asia Discount Center and the transfer of ownership was completed no later than 1988. For these reasons, the trial court's findings are affirmed.

Affirmed.

_Andrus, J._

WE CONCUR:

_____

_Chun, J._