[No. 21516.   Department Two.   September 27, 1929.]

CHARLES A. MURRAY *et al., Appellants,* v. A. A. BOUSQUET *et al., Respondents.*[1]

*Carroll B. Graves, L. B. da Ponte,* and *Arthur E. Simon,* for appellants.

*D. A. Shiner,* for respondents.

MILLARD, J.—Plaintiffs commenced this action to quiet title to, and enjoin trespasses on, a parcel of land. By cross-complaint, the defendants claimed the same tract and prayed that their title thereto be quieted. The cause was tried to the court, and no findings of fact or conclusions of law were made. From the decree in favor of the defendants, the plaintiffs have appealed.

[1]Reported in 280 Pac. 935.

Appellants contend that a stream known as Swakane creek flows across their land, which is described as the south half of the southwest quarter of section seven, township twenty-four north, range twenty east, in Chelan county, the stream coming off of a government section on the west; thence across section eighteen and then flows across the north half of section seventeen and a small corner of the south half of section seventeen. It is insisted that the valley land and the stream are within the area of land purchased by appellants in accordance with the official government plat and survey; that, if not within the tract shown by the official plat as the south half of the southwest quarter of section seven, the appellants have by actual possession, use and occupancy of the land for the statutory period acquired title by adverse possession.

It is respondents' position that the creek and valley land are located on the lands belonging to the Entiat Lumber Company and leased to Bousquet and wife. The lands claimed by respondents, and in whom title thereto was quieted in this action, are described as

". . . *all of section seven except the south half of the southwest quarter,* and the south half of section seventeen except the northeast quarter of the northeast quarter of the southwest quarter of township twenty-four north, range twenty east."

Appellants make no claim to the lands described as the property of the respondents; nor do the respondents assert ownership of any of the lands described as the property of appellants.

Appellants first complain that the court erred in adopting a private survey, rather than the official government plat and survey, with reference to the location of Swakane creek.

The appellants and the Entiat Lumber Company deraign their respective titles through the Wenatchee

Land Company, from the Northern Pacific Railway Company, which in turn acquired title from the United States government. Appellant Murray testified that in 1908, the appellants ascertained from the government map in the land office at Olympia that Swakane creek flowed across the south half of the southwest quarter of section seven, whereupon the appellants purchased that and other subdivisions; that they at once appropriated the water of the stream and began cultivation of the land; that in 1911 or 1912 they built a fence across the valley on the west line of section seven, and they continuously maintained, for a longer period, a similar fence across the valley on the east line of section seventeen. The official government map, upon which appellants rely, illustrates the topography of the country in which the land in controversy is located. The map contains no legend explanatory of the unnamed lines, and there is nothing from which we may conclude that the white lines upon the map indicate the location of the creek or whether the lines represent depressions. It appears from appellant Murray's letter to respondents, under date of April 30, 1923, that appellants were doubtful as to the location of Swakane creek, and they endeavored to lease from respondents the land in dispute. That letter reads as follows:

"The official United States government survey shows the Swaulkane creek to cross the S½ SW¼ of Section 7-24N-20E. It appears that *an unofficial survey shows the stream to cross farther to the north.* The S½ SW¼ belongs to us. I am informed that the section, except that eighty, is included in the lease made by you to the Squillchuck Co. When they drove down from the hills last fall, we had some controversy as to their being on our lands. They were very courteous about it and there was no trouble at all. Of course, the official survey must control in the absence of monuments placed by surveyors, and so far as I

know, there is no monument at any corner of this section. In the absence of established monuments, the location would be determined by the natural monuments, an unquestionable one in this case being the creek. However, without regard to where the stream is located, I would like to hear from you on the subject of leasing the section, less the eighty acres, to me upon the expiration of the existing lease, with an option on my part to purchase, giving terms, etc. You are, of course, aware that *the land has no value except for grazing purposes.*"

A former United States deputy mineral surveyor, a civil engineer of more than twenty-five years' experience, made a survey to ascertain the location of Swakane creek. The map prepared by him, showing the result of that survey, is an exhibit in this action. From this it appears that the creek is approximately one-half mile north of the south half of the southwest quarter of section seven, and not located on the land of appellants. The civil engineer testified that he located the government corner between sections sixteen and seventeen at the quarter corner, and started from that point as the nearest known corner, then proceeded to tie known corners together. He recited in detail the measurements made, and further testified:

"Q. Did you locate the north line of 7 by any method? A. Why, the north line of 7, I can't tell you that I located it by any particular method, except by proportioning the distance north. *I was particularly interested in locating the southeast corner of one, the government maps indicate as being also the northwest corner of section 7.* Q. Did you locate that quarter corner of section one? A. I did. I found that on the ground. Q. Is that an original stake? A. It appears to be an original corner. Q. How did it check with the field notes? A. It checked very good with the field notes with both the south and west from the corner. Q. How far south from that point on the east line of section one is your location of the creek bed, the south

slope of the creek bed? A. From my points that I indicated . . . 732.7. Q. *Did that indicate that the creek bed was in the south half of the southwest quarter of section 7, or to the north of it? A. It would indicate that it was to the north of it.* Q. What did you do to verify the location of that corner . . . the southeast corner of section one? A. I measured that due south from the northeast corner of section one, the amount given in the government field notes as 84.15 . . . I think it is 84.15 chains.''

The foregoing testimony was properly admitted. The result of a survey made by a qualified surveyor who runs his lines from established government corners, as was done in this case, is competent evidence to show an error in a government map. We do not thereby hold that the court may correct errors in the location. The corners of the government subdivisions are where the government surveyors placed them, and corners thus established are conclusive as to location of boundary lines of sections. If original corners can be found, they govern, though inconsistent with the description in the map.

''We think the law is well established that the true corner is where the United States surveyor established it, notwithstanding its location may not be such as is designated in the plat or field notes.'' *Greer v. Squire,* 9 Wash. 359, 37 Pac. 545.

The proof is clear and convincing that Swakane creek is not in the south half of the southwest quarter of section seven.

Appellants next complain that the court erred in refusing to hold that the appellants had acquired title by adverse possession to the Swakane creek valley between the west line of section seven and the east line of section seventeen.

The appellants, relying upon the government map in the land office at Olympia, from which it appeared

that the Swakane creek flowed across the south half of the southwest quarter of section seven, purchased that and other subdivisions in 1908. In 1911 or 1912, they built a fence across the Swakane valley on the west line of section seven. A similar fence across the valley on the east line of section seventeen was built prior to 1912. The unfenced sides of the valley are inclosed on both sides by steep mountains, which appellants testified are effective to retain stock within the valley. The evidence in behalf of appellants is to the effect that, since the purchase of the land, the appellants have claimed the valley from fence to fence, and have kept their stock within the inclosure during the summer; that no one ever made any claim to the land during appellants' period of occupancy until 1926, when the Bousquets entered with their sheep, which were removed the next morning on request of appellants' caretaker. In 1925 or 1926, the appellants built a pipe line for the carrying of water from the creek. The only purpose for which the land was used by appellants was for the pasturing of a few head of cattle and horses during the summer.

It appears from the evidence on the part of respondents that the respondents have paid taxes on the disputed tract of land for the years 1916 to 1926, inclusive. The land, which is fit only for grazing, was leased by respondents in 1921 to the Squillchuck Sheep Company. One of the employees of that company grazed sheep there for a week in 1921. That employee testified that some one on the premises

". . . wanted to know if we would get our sheep out of there, that he would like to have it for his cattle. Q. Did you? A. No. Q. Did he come back again? A. No, he didn't come back any more. He didn't order us off, he said he would like to have us leave that for his cattle."

In 1926, when the Squillchuck Sheep Company's lease expired, Bousquet leased the land. He testified:

"Q. Are you interested in any way in the lands described in the complaint as being owned by the Entiat Lumber Company? A. I have a lease on them. For grazing purposes. Q. Does your lease tie up in point of time, with that of the Squillchuck Sheep Company? A. Yes. They had it up to 1926 and in 1926 they didn't use it, and I was short of feed and they told me I could use it, so I went down in the bottom of the creek and told the boys to feed it off. The following year, when their lease was up, I leased it, and have had it since. Q. Have you fed the creek bottom on 7, that part of 7 that is described in your lease and set up in the complaint as being owned by the Entiat Lumber Company? A. Yes. Q. That is all of 7 except the south half of the southwest quarter of 7? A. Yes; last year I didn't go down, because feed was very plentiful and I had my sheep in two bands, and I didn't have to go down there. I had plenty of feed, and didn't need to use that. Q. Was the water necessary to water your stock in 1926? A. Yes, we watered in there. Q. Is the land in section 7 put to any other purpose than grazing? A. No, all it is is just grazing land."

The fence is described by respondents' witnesses as a drift fence, or a fence with four or five strands of wire on posts that will turn cattle, but will not prevent the entry of sheep on to the land.

The appellants have maintained a fence at each end of the valley for not less than fifteen years. The land inclosed has not been improved or cultivated by the appellants, but has been used solely for the pasturing of a few head of cattle and horses during the summer. There is no evidence of the erection of any buildings of any kind upon the property. The lessees of the respondent Entiat Lumber Company have used the land intermittently since 1921 for sheep grazing. The owner of the land is an absentee landlord with offices in Chicago, Illinois. The entry of the appellants upon

the land was made in good faith. They believed that the valley land was located, as they understood the description on the government map, in the south half of the southwest quarter of section seven. The good faith of appellants is disclosed by the letter from appellant Murray to respondents in 1923, when appellants endeavored to lease or buy the land, having learned that the creek was not on the subdivision purchased by appellants in 1908. That letter was the first information received by the Entiat Lumber Company that its title to the valley land might be challenged.

In asserting title by adverse possession to land of the character of that here involved, the element of notice is important. This is a wild country, broken, mountainous, very sparsely settled, and a small portion of it might be taken and held for years without any one knowing whether there was a trespass or not. Appellants mistook their boundaries and, we are convinced, never intended to set up a claim to lands not within the description in their deed. They were willing to lease or to buy the land, when they learned there was a question as to the location of the creek.

"There are various circumstances which may be relevant as showing whether or not the possession was hostile and adverse; *such as the absence of the owner and his consequent ignorance of the adverse claim, or the unsettled condition of the country and consequent lack of notoriety of the claim.* But the presumption is not necessarily defeated by the mere ignorance or inattention of the owner as to the adverse claim, as the use may continue so long without objection as to warrant the inference of an implied consent or of a grant." Jones Commentaries on Evidence (2d Rev. ed.), § 318.

"All the authorities hold that the question of adverse possession is a question of fact, and it must be

a possession that is known to the owner of the legal title. If there is direct proof that the owner of the legal title knew of the adverse possession, it is not necessary to go further, but the presumption is that if the adverse possession is open and notorious the owner of the title will know it." *McAuliff v. Parker,* 10 Wash. 141, 38 Pac. 744.

"Possession, in order to effect an ouster or disseisin of the true owner, must possess such notoriety that the owner may be presumed to have notice of it, so that the owner is guilty of laches in failing to assert his title during the statutory period against the claimant. *'Notorious' means such elements of notoriety as that the owner may be presumed to have notice of it and its extent.* Occupancy must be so notorious that the owner may be presumed to have knowledge that the occupancy is adverse." Thompson on Real Property, § 2520.

To hold that the entry and occupation here relied on as adverse are of such nature and notoriety that the owner must be presumed to know that there was a possession of the land, would be to announce a rule under which a man might be disseised without his knowledge, and the statute of limitations would run against him when he had no reason to believe that his seisin had been interrupted. The land is located in a wild and mountainous country and is used only for grazing. The possession of appellants is limited to the pasture season. Few people, other than hunters and sheep herders, visit the land. A parcel of such land might be taken, fenced and held for years and none know—and this, of course, includes the taxpaying owner three thousand miles away who leased the land to sheep herders—that a trespass was being committed. There is no evidence that, prior to appellants' letter in 1923 to the Entiat Lumber Company, respondents had knowledge or notice of a claim by adverse possession of the land; nor, under the facts of this

case, was the occupancy of such nature and notoriety that the respondents are presumed to have knowledge thereof.

The decree is affirmed.

MITCHELL, C. J., PARKER, FRENCH, and MAIN, JJ., concur.