[No. 30077. Department Two. May 1, 1947.]

JOHN KALIN *et al., Appellants,* v. NELLIE M. LISTER,
*Individually and as Executrix, Respondent.*[1]

*Clarence M. Boyle* and *George F. Yantis,* for appellants.

*Louis Muscek* and *Thomas L. O'Leary,* for respondent.

HILL, J.—The parties to this litigation own adjoining properties at the southwesterly end of Clear lake, in Thurston county. The appellants own government lot 3, which is that portion of the northeast quarter of the northwest quarter of section 6, township 15 north, range 3 east, W. M., lying westerly of Clear lake. The respondents own the property immediately south of the appellants, which is described as government lot 6, in the same section, and includes the southeast quarter of the northwest quarter of

[1] Reported in 180 P. (2d) 86.

section 6, and about six-tenths acre of the northeast quarter of the northwest quarter lying easterly of Clear lake and contiguous to the southeast quarter of the northwest quarter.

Section 6 was first surveyed in 1897, and, based on that and earlier township surveys, the government map of township 15 (respondents' exhibit No. 1) was approved by the surveyor general in 1898, on the theory, apparently erroneous, that Clear lake crosses the normal boundary line between the northeast and southeast quarters of the northwest quarter, and, hence, that six-tenths acre of the northeast quarter of the northwest quarter was physically separated from the portion of that government subdivision lying west of the lake and designated as lot 3. The six-tenths acre was, therefore, added to the southeast quarter of the northwest quarter, and the whole thereof was designated as lot 6.

From the evidence, it would appear that the lake does not actually cross the normal boundary line between the northeast and southeast quarters of the northwest quarter of section 6, and, if that line were extended east to the north and south center line of the section, there would be a narrow corridor connecting that portion of the northeast quarter of the northwest quarter lying west of the lake, with that portion of the northeast quarter of the northwest quarter lying east of the lake, which corridor would be between two and one-half and four feet in width at its narrowest point.

Under such a state of facts, there never should have been a lot 6, and the southeast quarter of the northwest quarter should have been described as such, and the six-tenths acre in the northeast quarter of the northwest quarter lying east of the lake should have been part of lot 3. Were that the situation, the appellants, as owners of lot 3, would have all of the lake frontage and the respondents would have none. However, both of these parties bought their property with reference to the government map (respondents' exhibit No. 1), which indicates that the lake does impinge on the southeast quarter of the northwest quarter, and that

a small portion of the northeast quarter of the northwest quarter was thereby cut off from lot 3 by the lake and has been added to the southeast quarter of the northwest quarter and constituted part of lot 6.

The appellants acquired title to lot 3 from the state of Washington in 1930, and the second-class shorelands adjacent thereto and abutting thereon, in 1945. S. G. Lister, through whom the respondents deraign title, acquired title to lot 6 from the state of Washington in 1940, and to the second-class shorelands adjacent thereto and abutting thereon, in 1942. The appellants cannot now claim, nor do they seriously contend, that the survey and property description can now be changed to conform to the actual situation. Although that issue is raised in their pleadings and argued to some extent in their opening brief, it is abandoned in their conclusion as to what should be done, as set forth in the last two pages of their reply brief.

If the lake did impinge upon or cross the normal line between the northeast and southeast quarters of the northwest quarter of section 6, the eastern terminus of that line would be the point of contact with the line of ordinary high water of Clear lake, and that would be the most southeasterly point of lot 3. The northerly line of lot 6 would, from that point, follow the line of ordinary high water of Clear lake to its intersection with the north and south center line of section 6.

But, since the lake does not actually impinge upon or cross the normal line between the northeast and southeast quarters of the northwest quarter, we are confronted with the question of determining where that line terminates and the course of the northerly line of lot 6 from that point. Respondents' exhibits Nos. 6 and 7 are maps prepared under the direction of respondents' witness, Harold B. Walker, who made a complete and thorough survey. These exhibits show the government meander line, balanced from the official record, as a heavy black line in exhibit No. 6, and as a broken heavy black line in exhibit No. 7, and it will hereafter be referred to as the black line.

On exhibit No. 7, there appears a broken heavy red line, which Mr. Walker believed to be the actual field location of the government meander line, and which will hereafter be referred to as the red line. The difference between these two lines is due to what Mr. Walker said is an error of one chain (sixty-six feet) in one of the calls. These two lines are, generally speaking, parallel and sixty-six feet apart in their courses around the southerly end of Clear lake. However, due to the angle at which they cross the normal line between the northeast and southeast quarters of the northwest quarter of section 6, the normal line is intersected by the red line at a point 718.66 feet east of the common corner (the northwest corner of the southeast quarter of the northwest quarter, and the southwest corner of the northeast quarter of the northwest quarter), whereas it is intersected by the black line at a point 926.56 feet east of that corner.

The parties are agreed that the location of the true meander line should be determinative of the major issue here. The appellants say that it is the black line, as shown on exhibits Nos. 6 and 7; respondents say it is the red line, as shown on their exhibit No. 7.

The trial court agreed with the respondents and fixed the terminus of the normal line between the northeast and southeast quarters of the northwest quarter of section 6, at a point 718.66 feet east of the common corner, and then found that the boundary line ran from that point north 21° 32′ 38″ east a distance of 38 feet, to the southerly line of ordinary high water of Clear lake; thence along that line easterly to its intersection with the north and south center line of section 6. It is not clear, from the record, how the particular course from the terminus of the normal line to the ordinary high-water line was determined, and it does not appear to constitute a perpendicular to the meander line at that point.

■ With appellants' contention that the black line is the meander line, we agree. It is the line established by the notes of the government survey. It closes under the rules applicable to such surveys, and no necessity exists for

the substitution of another line in lieu thereof. While the testimony of respondents' engineer, Mr. Harold B. Walker, is quite persuasive that an error of one chain was made in one of the calls, which throws the line, as established by the government survey, out into deep water at many points, we do not believe that either Mr. Walker or the courts are authorized to change the line as established by the survey.

"Whether the official survey made by Connelly is erroneous, or should give way to the extent of its discrepancies to the survey reported by McLeran, is a question which was not within the province of the court below, nor is it the province of this court to consider and determine. The mistakes and abuses which have crept into the official surveys of the public domain form a fruitful theme of complaint in the political branches of the government. The correction of these mistakes and abuses has not been delegated to the judiciary . . .

"That the power to make and correct surveys of the public lands belongs to the political department of the government and that, whilst the lands are subject to the supervision of the General Land Office, the decisions of that bureau in all such cases, like that of other special tribunals upon matters within their exclusive jurisdiction, are unassailable by the courts, except by a direct proceeding; and that the latter have no concurrent or original power to make similar corrections, if not an elementary principle of our land law, is settled by such a mass of decisions of this court that its mere statement is sufficient. [Citing cases.]

"The reason of this rule, as stated by Justice Catron in the case of *Haydel v. Dufresne* [17 How. 23], is that 'great confusion and litigation would ensue if the judicial tribunals, state and federal, were permitted to interfere and overthrow the public surveys on no other ground than an opinion that they could have the work in the field better done and divisions more equitably made than the department of public lands could do.' 17 How. 30." *Cragin v. Powell,* 128 U. S. 691, 697, 32 L. Ed. 566, 9 S. Ct. 203.

The foregoing is quoted in part, with approval, in *Greer v. Squire,* 9 Wash. 359, 364, 37 Pac. 545.

In *Kneeland v. Korter,* 40 Wash. 359, 82 Pac. 608, 1 L. R. A. (N. S.) 745, we said:

"In other words, the survey is claimed to have been erroneous. It may sometimes be difficult to definitely and accurately locate the line of ordinary high tide. Physical changes going on for a number of years may alter the location of said line. There must be, touching a survey, some authority recognized for legal purposes as correct. It would seem that the survey made by the United States surveyors, after standing forty years or more, as has this, should constitute such authority. It should be presumed as correct in a case where its disturbance would upset titles and destroy the rights of those who have in good faith relied upon it for many years. 'The official surveys made by the government are not open to collateral attack in an action at law between private parties.' [Citing U. S. supreme court cases.]"

In *Rohrbach v. Sanstrom*, 172 Wash. 405, 20 P. (2d) 28, the appellants contended that the discrepancies were so glaring as to indicate that no survey was in fact ever made. They contended, further, that, if there was a survey, it was so obviously erroneous and constituted such a wide departure from the actual conditions that it was clearly indicated that the meander line could not have been run as shown on the official plat. The court, in answering these and other contentions of the appellants in that case, said:

"Indicative of the fact that the survey was actually made, we have the disclosure of the government field notes and the record of the survey, which seem to have stood unimpeached for seventy-five years, and with reference to which the state of Washington itself executed its deed to appellants. A government survey is authoritative, and is not open to collateral attack between private parties. *Kneeland v. Korter*, 40 Wash. 359, 82 Pac. 608, 1 L. R. A. (N. S.) 745; *Cragin v. Powell*, 128 U. S. 691; *Russell v. Maxwell Land Grant Co.*, 158 U. S. 253; *Horne v. Smith*, 159 U. S. 40; *United States v. Boynton*, 49 Fed. (2d) 810.

"Appellants' third contention is that, even if it be held that a survey was made, its outline should be controlled by natural monuments in preference to courses and distances. It may be true, as a general proposition and where other things are equal, that, in locating the boundaries of land, resort is first had to natural objects, artificial monuments and adjacent boundaries, in the order just expressed, and thereafter to courses and distances. But here, while the

government field notes in one or two instances refer generally to high banks and a sandy beach, descriptive of a general locality, no fixed points or monuments thereon are designated.

"The survey was made many years ago when the country was new, and when absolute accuracy was not as essential as it is now. Nor is there any proof in the record that physical conditions then existing have not materially changed since that time. Based upon that survey, which was official, property rights have become vested. These are not to be lightly upset. In this case, the original point is the southwest corner of the fractional government lot, and is definitely known. From thence the survey proceeds regularly by courses and distances, and there is no showing that it does not actually fit into the point of last call. From the standpoint of fact, as well as of law, the survey has not lost that authoritativeness to which it was entitled in its inception."

The case of *Murray v. Bousquet,* 154 Wash. 42, 280 Pac. 935, relied on by the respondents, is clearly not authority for the proposition that a private survey may be used to establish lines different from those fixed by the field notes of a government survey.

We therefore hold, with the appellants, that the line between government lots 3 and 6 is the normal line between the government subdivisions to the point 926.56 feet east of the common corner, where it is intersected by the black line shown on respondents' exhibits Nos. 6 and 7, which we find is the government meander line.

■■ However, we cannot follow appellants in their contention that the meander line becomes the boundary line of lot 6 from that point. The boundary line from that point should be a line drawn at right angles to the meander line and extending to the line of ordinary high water of Clear lake (*Spath v. Larsen,* 20 Wn. (2d) 500, 148 P. (2d) 834), and from that point the line of ordinary high water of Clear lake becomes the northerly boundary of lot 6 to its intersection with the north and south center line of section 6, and the easterly boundary of lot 3 to its intersection with the north line of that section. The case of *Spath v. Larsen,* just cited, points out that a line drawn perpendicular to the

meander line does not always constitute a desirable or proper boundary line, but that it is proper under certain circumstances, where the shoreline is reasonably straight. The situation here does not seem to require the application of any of the more complicated rules suggested in that case.

The meander line is not ordinarily a boundary line, and the evidence here indicates that the meander line is not actually coincident with the high-water line. The ordinary high-water line should, therefore, be the boundary. *Ghione v. State,* 26 Wn. (2d) 635, 175 P. (2d) 955; *Washougal & LaCamas Transp. Co. v. Dalles, P. & A. Nav. Co.,* 27 Wash. 490, 68 Pac. 74; *Johnson v. Brown,* 33 Wash. 588, 74 Pac. 677; *Schmitz v. Klee,* 103 Wash. 9, 173 Pac. 1026; Patton on Titles, § 66.

Our determination that the black line shown on the respondents' exhibits Nos. 6 and 7 is the true meander line, will make necessary the granting of certain of the affirmative relief prayed for by the appellants, with reference to restoring them to the possession of certain portions of lot 3 now occupied by the respondents. The cause is, therefore, remanded to the superior court with instructions to make such changes in the findings of fact, conclusions of law, and judgment as the circumstances may require and which are not inconsistent with the views expressed herein.

MALLERY, C. J., STEINERT, ROBINSON, and JEFFERS, JJ., concur.