FILED
JUNE 9, 2016
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| LARRY B. JUDD, and CHERYLL L. JUDD, a marital community; and CHRISTOPHER L. JUDD, a married individual, | ) ) ) ) ) | No. 33060-5-III |
| Appellants, | ) ) | UNPUBLISHED OPINION |
| v. | ) ) | |
| RON JOHNS, and SUZANNE JOHNS, a marital community; and JAY HEALY, a single individual, | ) ) ) ) | |
| Respondents. | ) | |

SIDDOWAY, C.J. — Larry, Cheryll and Christopher Judd sued to quiet title to the

western 50 feet of property to which they hold record title. Instead, following a bench

trial, the trial court quieted title in Ron and Suzanne Johns and Jay Healy, the Judds'

neighbors to the west. The Judds assign error to only the trial court's conclusions of law.

We find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

In dispute is a 50-foot strip of land that runs north and south between the

properties of Jay Healy and Ronald and Suzanne Johns, on the one hand, and the Judds,

on the other. The following illustration from the parties' briefing in the trial court is

helpful; the disputed area falls between the surveyed boundary line on the west, and an

historic fence on the east:



Figure 1: Judd/Healy/Johns Boundary Lines

Clerk's Papers (CP) at 146.

The following are uncontested findings entered following a two-and-a-half-day

bench trial. At the time the Judds purchased their property in 1999, Larry Judd was

aware of a discrepancy between an existing fence line between his property and that of

his neighbors to the west, and the property line as established by a survey. CP at 796

(Finding of Fact 1.2). According to the survey, 50 feet of land to the west of the fence

belonged to the Judds. Although Mr. Judd was aware of the discrepancy, he did nothing

to assert his right to the disputed area until 13 years later. *Id.* (Finding of Fact 1.3).

2

Jay Healy had purchased his property in 1971 and thereafter used the entire parcel up to the fence line for various purposes, including as pasture for livestock. *Id.* (Finding of Fact 1.4). His use of the property was open and notorious, actual and uninterrupted, exclusive, and hostile to the true owners. His use continued for more than 10 years. CP at 797 (Finding of Fact 1.5).

The Johns purchased their property in 2006 from Edith Nendl. CP at 796 (Finding of Fact 1.1). Ms. Nendl and her husband, who had acquired the property and built their home in 1973, had used their entire parcel up to the fence line, including as pasture for their horses. CP at 797 (Finding of Fact 1.6). They maintained the fence and used the 50-foot strip consistent with ownership. *Id.* The Nendls' use of the land was open and notorious, actual and uninterrupted, exclusive, and hostile to the true owners and continued for a period of more than 10 years. *Id.* (Finding of Fact 1.7).

After the trial court issued its memorandum opinion on July 25, 2014, the Judds moved for reconsideration, arguing that the court failed to address their statutory right to recover taxes and assessments they had paid on the 50-foot strip. The court denied the motion on the basis that the Judds failed to specifically plead such a counterclaim and presented no evidence at trial as to the amount of taxes and assessments attributable to the strip.

The Judds appeal the trial court's memorandum opinion, its order denying their motion for reconsideration, and its order quieting title. The Johnses and Mr. Healy cross

3

appeal the trial court's denial of their motion for an award of reasonable attorney fees for an action they contend was frivolous.

## ANALYSIS

In appealing the trial court's order quieting title in Mr. Healy and the Johnses, the Judds do not assign error to any of the trial court's findings of fact, but make four legal arguments: that (1) when the proper legal standards are applied, the facts as found by the court do not support the trial court's determination that Mr. Healy and the Nendls acquired title by adverse possession; (2) any title acquired by the Nendls through adverse possession was not conveyed to the Johnses by a deed; (3) even if the defendants acquired title through adverse possession by 1999, the Judds reacquired title through their own adverse possession thereafter, or under the "vacant land" statute, RCW 7.28.080; and (4) they are entitled, at a minimum, to be reimbursed for taxes they paid on the disputed property.

Mr. Healy's and the Johnses' cross appeal contends the claims advanced by the Judds have been frivolous and we should reverse the trial court's denial of their motion for an award of reasonable attorney fees.

We address the issues in the order stated, and then address all parties' request for an award of reasonable attorney fees on appeal.

4

APPEAL

*1. The trial court's findings support Mr. Healy's and the Johnses'
acquisition of title by adverse possession*

Adverse possession is a mixed question of law and fact. *Chaplin v. Sanders*, 100 Wn.2d 853, 863, 676 P.2d 431 (1984). In a bench trial, the court determines whether the requisite facts exist as the trier of fact, but determines whether those facts constitute adverse possession as an issue of law. *See id.* As an issue of law, we review the determination of adverse possession de novo. *Bryant v. Palmer Coking Coal Co.*, 86 Wn. App. 204, 210, 936 P.2d 1163 (1997).

To establish a claim of adverse possession, a party's possession of property must be: (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile and under a claim of right made in good faith. *Chaplin*, 100 Wn.2d at 857. All of these elements must exist concurrently for at least 10 years. RCW 4.16.020. Because courts presume that the holder of legal title is in possession, "the party claiming to have adversely possessed the property has the burden of establishing the existence of each element." *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989).

The Judds have not assigned error to any of the trial court's findings of fact. Their first assignment of error invokes the principle announced in *Peeples v. Port of Bellingham* that where the parties "agree on the essential facts relevant to a claim of adverse possession," the issue of whether a party is entitled to title by right of adverse

5

possession presents a pure question of law. 93 Wn.2d 766, 772, 613 P.2d 1128 (1980), *overruled on other grounds by Chaplin*, 100 Wn.2d at 861 n.2. They argue that if the law is properly applied to the facts found by the court, it does not support the determination that Mr. Healy and the Johnses acquired title by adverse possession.

Because the trial court determined that Mr. Healy and the Nendls acquired title by adverse possession before the Judds acquired their land in 1999, it is the evidence of use before 1999 that is relevant.

### Exclusive Possession

The Judds argue the trial court misapplied the law relating to the element of exclusive possession. "In order to be exclusive for purposes of adverse possession, the claimant's possession need not be absolutely exclusive. Rather, the possession must be of a type that would be expected of an owner under the circumstances." *Crites v. Koch*, 49 Wn. App. 171, 174, 741 P.2d 1005 (1987). Shared possession with the legal title holder usually defeats exclusivity. *ITT Rayonier, Inc.*, 112 Wn.2d at 758; 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 8.19 (2d ed. 2004). But "[t]rifling encroachments by an owner on land held adversely does not render the claimant's use nonexclusive." *Crites*, 49 Wn. App. at 175; *see also ITT Rayonier, Inc.*, 112 Wn.2d at 758-59.

Undisputed facts bearing on exclusivity were summarized in the trial court's memorandum opinion:[1]

> [Mr. Healy] testified that he planted pasture which extended all the way to the fence line and that he actively utilized areas of the disputed strip for his horses and a later calf-feeding program and thoroughbred racehorse operation. In order to contain his thoroughbreds, in the late 1970s he installed hundreds of T-posts made of high-quality heavy grade steel. He also testified that later, after the 10-acre parcel to the south was purchased (Nendl), he grazed his horses with the permission of the owner on that land and continued to use the disputed strip as described. Healy also kept a herd of Scottish Highlander Longhorns on the property during the late 1980s and early 1990s. He testified that he pastured his cattle on parts of the disputed strip and that the fence existing then was sufficient to contain these animals.
>
> . . . .
>
> Edith Nendl, the prior owner of the Johns' property, testified that at the time of the sale to the Johns, her land was fenced on the south and east sides and that the Nendls' and Mr. Healy had constructed the fence along the line that divided their two properties. She testified that her daughter's horse, along with Mr. Healy's horses, pastured on her property and that all of the fences were improved in order to contain the horses and that the disputed area on the east side of her land was used by the horses until the Johns bought the land in 2006. When she moved onto the property in 1973, the north-south fence was present running along the east side of her property and Healy's property; that for the 33 years she lived on the property, she believed that she owned the disputed strip and acted accordingly.

CP at 416-17.

---

[1] Where, as here, the court's written findings do not fully detail the premises on which the trial court based its decision, we may look to the court's memorandum opinion. *Heikkinen v. Hansen*, 57 Wn.2d 840, 845, 360 P.2d 147 (1961).

No party introduced evidence that anyone but Mr. Healy and the Nendls used the disputed strip of land from the early 1970s until the Judds purchased their property in 1999. Before 1999, the property presently owned by the Judds was owned by an absentee owner by the name of Williams, who, to the parties' knowledge, never maintained or even visited the property.

These facts are more than sufficient to establish exclusive possession by Mr. Healy and the Nendls before 1999. The Judds nonetheless argue that after they purchased their property in 1999, they announced their ownership and freely used the disputed property to a limited extent, thereby supporting shared possession. But what happened after 1999 is irrelevant. By then, the westerly neighbors had acquired title by adverse possession.

*Open & Notorious Use*

The Judds next argue the court misapplied the law relating to the element of open and notorious use. Possession is open and notorious if the legal titleholder has actual or constructive notice of the claimant's use. *Chaplin*, 100 Wn.2d at 862-63. To charge the legal titleholder with constructive notice, the claimant's "'use and occupancy need only be of the character that a true owner would assert in view of its nature and location.'" *Id.* at 863 (emphasis omitted) (quoting *Krona v. Brett*, 72 Wn.2d 535, 539, 433 P.2d 858 (1967), *overruled on other grounds by Chaplin*, 100 Wn.2d at 861 n.2).

8

The Judds rely on the absentee ownership of their predecessor, Mr. Williams, and attempt to bring themselves within the holding of *Murray v. Bousquet*, that where a legal titleholder is absent from land that is "wild country, broken, mountainous, [and] very sparsely settled," a presumption of known use does not arise as readily from open and notorious use. 154 Wash. 42, 49, 280 P. 935 (1929).

In *Murray*, the disputed property was in a wild and mountainous country suitable only for grazing. 154 Wash. at 50. While the claimants built a fence on the property, they only used the property during the summer and did not build on, cultivate, or improve it. *Id.* at 48. "Few people, other than hunters and sheep herders, visit[ed] the land." *Id.* at 50. The court concluded it could not charge the absentee owner with constructive knowledge where the character of the land was such that someone could take, fence and hold a portion for years without anyone knowing of an adverse claim. *Id.*

The properties at issue in this case are located in an area that appears from exhibits to be mostly flat, not mountainous. Rather than wild and remote, these properties were partially cultivated and improved in the relevant time frame. Some of the property is wooded, but it appears that most is open grassland. While the property now owned by the Judds that is east of the fence line was unoccupied before 1999, both Mr. Healy and the Nendls lived in homes on their properties from the early 1970s. The fence was present on the property during the entire period and the land to the west of the fence was being used as pasture.

The Judds did not call Mr. Williams as a witness, so it is not known whether he had actual notice of use of the disputed strip by his neighbors to the west; if he did, that alone would establish the element of open and notorious use. *Id.* at 50. Regardless, given the accessible rural character of the partially cultivated and developed property in the area, the undisputed facts establish use that was sufficiently open and notorious to give rise to the presumption of notice.

*Presumption of Permissive Use*

The Judds argue that neither Mr. Healy nor the Nendls can establish that their possession of the disputed property was hostile because they failed to rebut a presumption of permissive use. For support, they cite four decisions of our Supreme Court,[2] but each of the cases addresses prescriptive easements. Although adverse possession and prescriptive easements are similar, they are not identical.[3]

---

[2] *Gamboa v. Clark*, 183 Wn.2d 38, 44-46, 348 P.3d 1214 (2015); *Nw. Cities Gas Co. v. W. Fuel Co.*, 13 Wn.2d 75, 84, 123 P.2d 771 (1942); *Bukley v. Dunkin*, 131 Wash. 422, 425, 230 P. 429 (1924); and *Roediger v. Cullen*, 26 Wn.2d 690, 714, 175 P.2d 669 (1946).

[3] As observed in *Kunkel v. Fisher*, 106 Wn. App. 599, 603-04, 23 P.3d 1128 (2001):

Although adverse possession and easements by prescription are often treated as equivalent doctrines, they have different histories and arise for different reasons. Adverse possession promotes the maximum use of the land, encourages the rejection of stale claims to land and, most importantly, quiets title in land. Easements by prescription do not necessarily further those same goals. Their principal purpose is to protect long-established positions. Easements by prescription are disfavored in the

10

Even in the context of prescriptive easements, our Supreme Court observed in the decision in *Gamboa* that it has limited the presumption of permissive use to three factual scenarios: unenclosed land cases, enclosed land cases in which it is reasonable to infer neighborly acquiescence, and the use of a road in a noninterfering manner. 183 Wn.2d at 44. Assuming without holding that the principles for applying presumptions in *Gamboa* apply in adverse possession cases, the Judds would have to show that one of those three factual scenarios applies before they would be entitled to a presumption of permissive use.

The Judds' failure to show that Mr. Williams was aware of his westerly neighbors' use prevents an inference of neighborly acquiescence. This case does not involve mutual use of a road. And Mr. Healey and the Nendls were using fenced land, not unenclosed land: they were using the 50 feet on their side of the historic fence line. The Judds fail to demonstrate any basis on which they were entitled to a presumption of permissive use.

---

law because they effect a loss or forfeiture of the rights of the owner. On the other hand, adverse possession is not disfavored. The differences in the historical origins and rationales behind prescriptive easement and adverse possession have resulted in a single but important difference in how they are applied.

In a claim for a prescriptive easement there is a presumption that the servient property was used with the permission of, and in subordination to, the title of the true owner. If the use is initially permissive, it may ripen into a prescriptive easement only if the user makes a distinct, positive assertion of a right adverse to the property owner.

(Footnotes omitted.)

11

The Judds also argue that Mr. Healy and the Johnses cannot establish hostile possession after 1999 because the Judds asserted their ownership at that time and any use of the property thereafter was necessarily permissive. Since Mr. Healy and the Nendls acquired title by adverse possession before 1999, they and their successors' use could not have been permissive.

### 2. It is settled Washington law that title acquired by adverse possession is implicitly conveyed to a successor occupant who is in privity

The Judds argue that because the Johnses did not purchase until 2006, they cannot establish all the elements of possession for 10 years before the Judds filed their action to quiet title in 2011. They make related arguments that the Johnses cannot "tack" their period of adverse use with the Nendls and have not demonstrated that any title acquired by the Nendls was conveyed to them. Well settled law addresses whether and how title to property acquired by adverse possession is conveyed between successive occupants.

"When real property has been held by adverse possession for ten years, such possession ripens into an original title. . . . The person so acquiring this title can convey it to another party without having had title quieted in him prior to the conveyance." *El Cerrito, Inc. v. Ryndak*, 60 Wn.2d 847, 855, 376 P.2d 528 (1962). The description in the deeds will be held to include the disputed property "where there is privity between the successive occupants." *Id.* at 856 (quoting *Faubion v. Elder*, 49 Wn.2d 300, 307, 301

12

P.2d 153 (1956), *overruled in part on other grounds by Chaplin*, 100 Wn.2d 853); *see also Buchanan v. Cassell*, 53 Wn.2d 611, 614, 335 P.2d 600 (1959).

"Privity" for this purpose does not require a deed that conveys both the property to which the seller holds record title and the property acquired through adverse possession. In *Howard v. Kunto*, for example, the privity required for a deemed conveyance of title acquired by adverse possession was found where a deed completely misdescribed the property formerly occupied by a seller and thereafter occupied by its buyer. 3 Wn. App. 393, 400, 477 P.2d 210 (1970), *overruled in part on other grounds by Chaplin*, 100 Wn.2d 853. The court explained that "the requirement of 'privity' is no more than judicial recognition of the need for some reasonable connection between successive occupants of real property so as to raise their claim of right above the status of the wrongdoer or the trespasser." *Id.*; *see also Naher v. Farmer*, 60 Wash. 600, 111 P. 768 (1910) (permitting tacking when disputed land was not described in deed because the various owners believed they owned all the land enclosed by the fence). "A formal conveyance between the parties describing some or all of the property is not essential to establish such connection." *Shelton v. Strickland*, 106 Wn. App. 45, 52-53, 21 P.3d 1179 (2001).

These principles are distinct from the concept of "tacking" that is applied where no single possessor has been in possession for the statutory period and the adverse possession of multiple claimants must be added together to establish title.

13

A variant form of tacking occurs when an adverse possessor has already acquired title by running out the statute and then transfers "what he has" to a successor. What he has at that point is not merely inchoate title but perfected legal title, though not paper title. In strict theory, the perfected title, being as full legal title as any documentary title, should be transferred by a deed. . . . However, strict theory notwithstanding, Washington courts also allow title thus perfected to be turned over by the same acts that, before it was perfected, would transfer it by tacking. Whether the process should be called "tacking" at this point is debatable, but, whatever it is, it is allowed.

17 STOEBUCK & WEAVER, *supra*, § 8.18, at 540 (footnote omitted).[4]

While the 50-foot strip was not included in the description of the property conveyed by the statutory warranty deed that passed title from the Nendls to the Johnses, it is clear under this long-standing Washington case law that because the Johnses acquired title to what the Nendls owned and at the same time assumed possession and use of the property up to the fence line, privity existed such that the title acquired by the

---

[4] Two cases cited by the Judds have nothing to do with how to construe the title conveyed between successive occupants of adversely possessed property. In *Mugaas v. Smith*, 33 Wn.2d 429, 431, 206 P.2d 332 (1949), the holder of record title to a strip of land tried to defeat the claim of a party who had adversely possessed it for the statutory period by arguing that she later lost title through discontinued use. The court held that a title acquired through adverse possession is as strong as a title acquired by deed and "cannot be divested . . . by any other act short of what would be required in a case where [] title was by deed." *Id.* (quoting *Towles v. Hamilton*, 94 Neb. 588, 143 N.W. 935, 936 (1913)). In *Gorman v. City of Woodinville*, 175 Wn.2d 68, 73, 283 P.3d 1082 (2012), the court cited *Mugaas* as authority for why a vested title acquired by adverse possession could not be lost through transfer or record title to a city acting in its governmental capacity, despite state law preventing limitations periods from running against the State. Neither decision had anything to do with the passage of title between successive occupants of adversely possessed property.

14

Nendls through adverse possession may now be claimed by the Johnses.[5]

### 3. Substantial evidence supports the trial court's implicit rejection of claims that the Judds reacquired the disputed strip

The Judds next argue that if their predecessor, Mr. Williams, lost title to the disputed strip as a result of adverse possession, then they reacquired title either through later adverse possession of their own, or under the "vacant land" statute, RCW 7.28.080.

*Adverse Possession under RCW 7.28.070*

RCW 7.28.070 provides that a claimant who adversely possesses property "under claim and color of title, made in good faith" and pays all taxes may acquire title in a shortened period of only 7 years, rather than the 10 year period provided by RCW 4.16.020(1). The Judds demonstrated their record title and that they paid taxes. But they were also required to prove the elements of adverse possession.

The Judds have not followed the procedure required to challenge the trial court's rejection of their adverse possession claim. In assigning error to the trial court's rejection of their "reacquired title" theories, they necessarily assign error to the court's implicit

---

[5] Relying on the same case law, we reject the Judds' request that we recognize and forbid a novel concept that they call "bad faith tacking" under which, if a party who knows before purchasing property that its predecessor claims ownership solely through adverse possession rather than record title, then the purchaser cannot claim to have acquired title through privity. We also note that the Judds have never shown that the Johnses knew at the time of their purchase that legal title was actually disputed, since it was only an anonymous caller, not the Judds, who provided notice to the Nendls' real estate agent of a possible encroachment.

15

factual findings rejecting the elements of their claims, despite their position that they have only raised legal error.

Not a single finding by the trial court supports any element of the Judds' claim to have adversely possessed the disputed strip after 1999. Every element of adverse possession is material. Where the trial court fails to make an express finding on a material fact, we deem the fact to have been found against the party having the burden of proof. *In re Eggers*, 30 Wn. App. 867, 873, 638 P.2d 1267 (1982). To advance this issue on appeal, then, the Judds should have assigned error to the trial court's deemed findings against them on the elements of adverse possession and then demonstrated that substantial evidence did not support the deemed adverse findings.

Instead, they merely point to some of their own evidence. They claim to have paid taxes on the property from 1999 to the present, but payment of taxes is an additional requirement of RCW 7.28.070, not a substitute for the elements of adverse possession, and it does not satisfy any of those elements. *See Loose v. Locke*, 25 Wn.2d 599, 605, 171 P.2d 849 (1946); *Austrian Am. Benevolent Cemetery Ass'n v. Desrochers*, 124 Wash. 179, 183, 214 P. 3, 216 P. 891 (1923).

The Judds' only evidence of actual use of the 50-foot strip was that Larry Judd would "periodically" cross the fence onto the Johnses' portion of the strip to cut grass with a hand sickle or spray for weeds. Report of Proceedings (RP) at 348. Mr. Judd

could not recall how many times he had tended the disputed strip, and his son testified

that Mr. Judd mowed the property only once a year.

"[I]t is not possible to be in adverse possession without physical occupation," 17

STOEBUCK & WEAVER, *supra*, § 8.9. Whether possession is uninterrupted is determined

with reference to the frequency with which owners in general would use property of like

nature and condition. *Howard*, 3 Wn. App. at 397. Possession is uninterrupted if "'the

land is occupied during the period of time during the year it is capable of use.'" *Id.* at

398 (quoting FRANK EMERSON CLARK & JOHN S. GRIMES, A TREATISE ON THE LAW OF

SURVEYING AND BOUNDARIES § 561, at 566 (3d ed. 1959)).

The trial record easily supports the trial court's implicit finding that the Judds

failed to prove any seven-year period of possession of the 50-foot strip after 1999 that

was exclusive, actual and uninterrupted, open and notorious, and hostile and under a

claim of right.

*The Vacant Land Statute*

RCW 7.28.080, the vacant land statute, is a "substitute for adverse possession,"

which allows good-faith title holders who have paid taxes to acquire title to property

without satisfying the elements of adverse possession—but it applies only to vacant land.

*Williams v. Striker*, 29 Wn. App. 132, 135, 627 P.2d 590 (1981). A claimant must prove

(1) color of title to the land, (2) the claimed title to the land is made in good faith, (3) the

17

land being claimed is vacant and unoccupied, and (4) the claimant paid all taxes legally assessed on the land for seven successive years. *Id.*

Land is not "vacant" for purposes of the statute if "any use of the questioned land, however temporary, consistent with its general nature," has been made of it. *Wilson v. Howard*, 5 Wn. App. 169, 172, 486 P.2d 1172 (1971). To counter a claim that property was vacant and unoccupied for the seven years, evidence of use by others "need not be so extensive as to support a claim for adverse possession." *Id.*

Here again, the Judds have not assigned error to findings deemed to have been made against them on the elements of the claim, and they have not properly advanced an argument of insufficient evidence. But here, too, the trial record easily supports the court's implicit findings against them. The evidence established that during the period of the Judds' ownership, a fence was located on the disputed property, that the fence was being repaired during that time frame, that the property up to the fence line was planted as pasture, and that the 50-foot strip was used by Mr. Healy, the Nendls and the Johnses to contain horses and other livestock. Substantial evidence supported the trial court's deemed finding that the disputed strip was not vacant and unoccupied.

### 4. The Judds failed to plead or prove an entitlement to be reimbursed for taxes paid

Finally, the Judds argue the trial court should have ordered Mr. Healy and the Johnses to reimburse the Judds for taxes paid on the disputed land based on RCW

18

7.28.160, which authorizes a counterclaim for taxes paid when an action is brought to recover property from a party.[6] A companion statute prescribes the procedure for pleading and trial of the counterclaim:

> The counterclaim shall set forth . . . the amount of said taxes and assessments so paid, and the date of payment. Issues shall be joined and tried as in other actions, and the value of the land and the amount of said taxes and assessments . . . must be specifically found by . . . findings of the court.

RCW 7.28.170.

The Judds did not specifically plead RCW 7.28.160 as the basis for a counterclaim, and asserted rights under the statute for the first time in their motion for reconsideration. They did not present evidence during the bench trial from which the trial court could determine what portion of the property tax they had paid was fairly allocable to the 50-foot strip. The only evidence they presented was a collection of their property tax statements from 2001 through 2013.

They nonetheless argue on appeal that they averred payment of taxes in their complaint and included a broad prayer for relief. But even if that were enough to show that a counterclaim "must be allowed" under RCW 7.28.160, their actions clearly fell

---

[6] *Consol. Freight Lines v. Groenen*, 10 Wn.2d 672, 680, 117 P.2d 966 (1941) states that the statute (previously Rem. Rev. Stat. § 797) "by its plain terms, indicates that it was intended to apply only to an action brought by the rightful owner, as plaintiff, to recover real property." Because the failure of pleading and proof is clear, we do not reach the issue of statutory construction.

short of the pleading requirements and trial proof required by RCW 7.28.170. The trial court did not err in failing to address the issue at trial nor did it abuse its discretion in denying the motion for reconsideration.

## CROSS APPEAL

Mr. Healy and the Johnses moved in the trial court for an award of attorney fees on the basis that the Judds' action was "frivolous and advanced without reasonable cause." RCW 4.84.185. In deciding the motion, the trial court noted that the Judds' complaint had initially been dismissed on summary judgment only to be reconsidered and reinstated after *Gorman*, in which Chief Justice Madsen stated in concurrence that "it is time to rethink the doctrine of adverse possession," because "[m]any of the beneficial purposes the doctrine is said to serve do not justify the doctrine in modern times." 175 Wn.2d at 75. In refusing to award fees, the trial court observed that some of the policy arguments cited by Justice Madsen were not unlike arguments made by the Judds during trial.

"The lawsuit or defense, *in its entirety*, must be determined to be frivolous . . . before an award of attorneys' fees may be made." *Biggs v. Vail*, 119 Wn.2d 129, 133, 830 P.2d 350 (1992). "A frivolous action is one that cannot be supported by any rational argument on the law or facts." *Goldmark v. McKenna*, 172 Wn.2d 568, 582, 259 P.3d 1095 (2011). The trial court's decision under RCW 4.85.185 is reviewed for abuse of discretion. *State ex rel. Quick-Ruben v. Verharen*, 136 Wn.2d 888, 903, 969 P.2d 64

20

(1998). Courts have found no abuse of discretion where causes of action were tenuous but not brought for the purposes of delay, nuisance, spite, or harassment. *Schmerer v. Darcy*, 80 Wn. App. 499, 509, 910 P.2d 498 (1996).

Even Justice Madsen acknowledged that the doctrine of adverse possession is a creature of statute that can only be altered by the legislature, and we have given no weight on appeal to the Judds' arguments from the *Gorman* concurrence. Nevertheless, we find no evidence that the Judds' action was initiated for the purposes of harassment, delay, nuisance, or spite. We find no abuse of discretion in the trial court's denial of a fee award.

ATTORNEY FEES ON APPEAL

Both parties request attorney fees on appeal under RAP 18.1.[7] Under RAP 18.1, the party requesting attorney fees must cite to authority to advise the court of the appropriate grounds for an award of attorney fees. *In re Marriage of Coy*, 160 Wn. App. 797, 808, 248 P.3d 1101 (2011).

The Judds rely on RCW 7.28.083(3), which provides that the prevailing party in an adverse possession action may request an award of fees, which is discretionary with the court. Not only have the Judds not prevailed, the statute applies to only those actions

---

[7] Mr. Healy and the Johnses refer to RAP 18.14, but because that rule has nothing to do with attorney fees, we construe it as a scrivener's error.

filed on or after July 1, 2012, and this action was filed in 2011. LAWS OF 2011, ch. 255, § 2. Mr. Healy and the Johnses fail to identify any authority for an award of attorney fees.

We deny both parties' fee requests.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Lawrence-Berrey, A.C.J.